# HODGSON ET AL. *v.* MINNESOTA ET AL.

No. 88–1125.   Argued November 29, 1989—Decided June 25, 1990*

---

*Together with No. 88–1309, *Minnesota et al.* v. *Hodgson et al.*, also on certiorari to the same court.

418

STEVENS, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, IV, and VII, in which BRENNAN, MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined, an opinion with respect to Part III, in which BRENNAN, J., joined, an opinion with

respect to Parts V and VI, in which O'CONNOR, J., joined, and a dissenting opinion with respect to Part VIII.  O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 458.  MARSHALL, J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part, in which BRENNAN and BLACKMUN, JJ., joined, *post*, p. 461.  SCALIA, J., filed an opinion concurring in the judgment in part and dissenting in part, *post*, p. 479.  KENNEDY, J., filed an opinion concurring in the judgment in part and dissenting in part, in which REHNQUIST, C. J., and WHITE and SCALIA, JJ., joined, *post*, p. 480.

*Janet Benshoof* argued the cause for petitioners in No. 88–1125 and respondents in No. 88–1309.  With her on the briefs were *Rachel N. Pine, Lynn M. Paltrow, Kathryn Kolbert, John A. Powell, William Z. Pentelovitch,* and *Rebecca A. Palmer.*

*John R. Tunheim*, Chief Deputy Attorney General of Minnesota, argued the cause for respondents in No. 88–1125 and petitioners in No. 88–1309.  With him on the briefs were *Hubert H. Humphrey III*, Attorney General, *Catharine F. Haukedahl*, Solicitor General, *Kenneth E. Raschke, Jr.*, Assistant Attorney General, and *John B. Galus*, Special Assistant Attorney General.†

---

†Briefs of *amici curiae* urging reversal were filed for the American Psychological Association et al. by *Donald N. Bersoff* and *Mark D. Schneider;* and for the Anti-Defamation League of B'Nai B'rith et al. by *Kenneth J. Bialkin, Peggy L. Kerr, Meyer Eisenberg, Justin J. Finger, Jeffrey P. Sinensky, Steven M. Freeman, Jill L. Kahn,* and *Livia D. Thompson.*

*Clarke D. Forsythe* and *Kent Masterson Brown* filed a brief for the Association of American Physicians and Surgeons as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the United States by *Solicitor General Starr, Acting Assistant Attorney General Schiffer, Deputy Solicitor General Merrill, Paul J. Larkin, Jr., Stephen J. Marzen,* and *Steven R. Valentine;* for the State of Louisiana et al. by *William J. Guste, Jr.,* Attorney General of Louisiana, *Jenifer Schaye* and *Meredith H. Lieux,* Assistant Attorneys General, *Jo Ann P. Levert, Thomas A. Rayner, Robert K. Corbin,* Attorney General of Arizona, *William L. Webster,* Attorney General of Missouri, and *Ernest D. Preate, Jr.,* Attorney General of Pennsylvania; for 274 Organizations in Support of *Roe v. Wade* by *Kathleen*

JUSTICE STEVENS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, IV, and VII, an opinion with respect to Part III in which JUSTICE BRENNAN joins, an opinion with respect to Parts V and VI in which JUSTICE O'CONNOR joins, and a dissenting opinion with respect to Part VIII.

A Minnesota statute, Minn. Stat. §§ 144.343(2)–(7) (1988), provides, with certain exceptions, that no abortion shall be performed on a woman under 18 years of age until at least 48 hours after both of her parents have been notified. In subdivisions 2–4 of the statute the notice is mandatory unless (1) the attending physician certifies that an immediate abortion is necessary to prevent the woman's death and there is insufficient time to provide the required notice; (2) both of her parents have consented in writing; or (3) the woman declares that she is a victim of parental abuse or neglect, in which event notice of her declaration must be given to the proper authorities. The United States Court of Appeals for the

M. Sullivan, Susan R. Estrich, Barbara Jordan, and Estelle H. Rogers; for the American Academy of Medical Ethics by Joseph W. Dellapenna; for the American College of Obstetricians and Gynecologists et al. by Carter G. Phillips, Elizabeth H. Esty, Ann E. Allen, Stephan E. Lawton, Laurie R. Rockett, and Joel I. Klein; for the American Family Association, Inc., by Peggy M. Coleman; for the Catholic League for Religious and Civil Rights et al. by Nancy J. Gannon and Thomas W. Strahan; for the Center for Population Options et al. by John H. Henn; for the Elliot Institute for Social Sciences Research et al. by Stephen R. Kaufmann; for Focus on the Family et al. by H. Robert Showers; for the Knights of Columbus by Brendan V. Sullivan, Jr., Kevin J. Hasson, and Carl A. Anderson; for the Luthern Church-Missouri Synod by Philip E. Draheim; for the National Right to Life Committee, Inc., by James Bopp, Jr.; for the United States Catholic Conference by Mark E. Chopko; for Representative Christopher H. Smith et al. by Mr. Bopp; for Members of the General Assembly of the Commonwealth of Pennsylvania by Maura K. Quinlin and Philip J. Murren; for 13 Individual Members of the Panel on Adolescent Pregnancy and Childbearing or the Committee on Child Development Research and Public Policy by Hannah E. M. Lieberman and Pamela H. Anderson; and for James Joseph Lynch, Jr., pro se.

Eighth Circuit, sitting en banc, unanimously held these provisions unconstitutional. In No. 88–1309, we granted the State's petition to review that holding. Subdivision 6 of the same statute provides that if a court enjoins the enforcement of subdivision 2, the same notice requirement shall be effective unless the pregnant woman obtains a court order permitting the abortion to proceed. By a vote of 7 to 3, the Court of Appeals upheld the constitutionality of subdivision 6. In No. 88–1125, we granted the plaintiffs' petition to review that holding.

For reasons that follow, we now conclude that the requirement of notice to both of the pregnant minor's parents is not reasonably related to legitimate state interests and that subdivision 2 is unconstitutional. A different majority of the Court, for reasons stated in separate opinions, concludes that subdivision 6 is constitutional. Accordingly, the judgment of the Court of Appeals in its entirety is affirmed.

I

The parental notice statute was enacted in 1981 as an amendment to the Minors' Consent to Health Services Act. The earlier statute, which remains in effect as subdivision 1 of § 144.343 and as § 144.346, had modified the common-law requirement of parental consent for any medical procedure performed on minors. It authorized "[a]ny minor" to give effective consent without any parental involvement for the treatment of "pregnancy and conditions associated therewith, venereal disease, alcohol and other drug abuse."[1]

---

[1] Subdivision 1 of § 144.343 presently provides:

"Any minor may give effective consent for medical, mental and other health services to determine the presence of or to treat pregnancy and conditions associated therewith, venereal disease, alcohol and other drug abuse, and the consent of no other person is required."

The statute permits the health professional treating the minor to notify parents only when a failure to do so would jeopardize the minor's health. Minn. Stat. § 144.346 (1988).

The statute, unlike others of its age,[2] applied to abortion services.

The 1981 amendment qualified the authority of an "unemancipated minor"[3] to give effective consent to an abortion by requiring that either her physician or an agent notify "the parent" personally or by certified mail at least 48 hours before the procedure is performed.[4] The term "parent" is defined in subdivision 3 to mean "both parents of the pregnant woman if they are both living." No exception is made for

---

[2] See Haw. Rev. Stat. § 577A–2 (1976); Mo. Rev. Stat. § 431.062 (Supp. 1971). See generally Pilpel & Zuckerman, Abortion and the Rights of Minors, in Abortion, Society and the Law 275, 279–280 (D. Walbert & J. Butler eds. 1973).

[3] Although there is no statutory definition of emancipation in Minnesota, see Streitz v. Streitz, 363 N. W. 2d 135, 137 (Minn. App. 1985), we have no reason to question the State's representation that Minn. Stat. §§ 144.341 and 144.342 (1988) apply to the minor's decision to terminate her pregnancy. Brief for Respondents in No. 88–1125, p. 2, n. 2. Those sections provide that a minor who is living separate and apart from her parents or who is either married or has borne a child may give effective consent to medical services without the consent of any other person.

The notification statute also applies to a woman for whom a guardian or conservator has been appointed because of a finding of incompetency. § 144.343(2). This portion of the statute is not challenged in this case.

[4] Subdivision 2 provides:

"Notwithstanding the provisions of section 13.02, subdivision 8, no abortion operation shall be performed upon an unemancipated minor . . . . until at least 48 hours after written notice of the pending operation has been delivered in the manner specified in subdivisions 2 to 4.

"(a) The notice shall be addressed to the parent at the usual place of abode of the parent and delivered personally to the parent by the physician or an agent.

"(b) In lieu of the delivery required by clause (a), notice shall be made by certified mail addressed to the parent at the usual place of abode of the parent with return receipt requested and restricted delivery to the addressee which means postal employee can only deliver the mail to the authorized addressee. Time of delivery shall be deemed to occur at 12 o'clock noon on the next day on which regular mail delivery takes place, subsequent to mailing."

a divorced parent, a noncustodial parent, or a biological parent who never married or lived with the pregnant woman's mother.[5] The statute does provide, however, that if only one parent is living, or "if the second one cannot be located through reasonably diligent effort," notice to one parent is

---

[5] The Minnesota statute is the most intrusive in the Nation. Of the 38 States that require parental participation in the minor's decision to terminate her pregnancy, 27 make express that the participation of only one parent is required. An additional three States, Idaho, Tennessee, and Utah, require an unmarried minor to notify "the parents or guardian" but do not specify whether "parents" refers to either member of the parental unit or whether notice to one parent constitutes constructive notice to both. See Idaho Code § 18–609(6) (1987); Tenn. Code Ann. § 39–15–202(f) (Supp. 1989); Utah Code Ann. § 76–7–304(2) (1990). In contrast, Arkansas does require an unmarried minor to notify both parents but provides exceptions where the second parent "cannot be located through reasonably diligent effort," or a parent's "whereabouts are unknown," the parent has not been in contact with the minor's custodial parent or the minor for at least one year, or the parent is guilty of sexual abuse. Ark. Code Ann. §§ 20–16–802, 20–16–808 (Supp. 1989). Delaware requires the consent only of parents who are residing in the same household; if the minor is not living with both of her parents, the consent of one parent is sufficient. Del. Code. Ann., Tit. 24, § 1790(b)(3) (1987). Illinois law does not require the consent of a parent who has deserted the family or is not available. Ill. Rev. Stat., ch. 38, ¶ 81–54(3) (1989). Kentucky requires an unmarried minor to obtain the consent of a legal guardian or "both parents, if available," but provides that if both parents are not available, the consent of the available parent shall suffice. Ky. Rev. Stat. Ann. §§ 311.732(2)(a), (b) (Michie 1990). Under Massachusetts law, an unmarried minor need obtain the consent of only one parent if the other parent "is unavailable to the physician within a reasonable time and in a reasonable manner," or if the parents are divorced and the other parent does not have custody. Mass. Gen. Laws § 112:12S (1988). Mississippi law requires only the consent of the parent with primary custody, care, and control of the minor if the parents are divorced or unmarried and living apart and, in all other cases, the consent of only one parent if the other parent is not available in a reasonable time or manner. Miss. Code Ann. § 41–41–53(2) (Supp. 1989). Finally, North Dakota requires only the consent of the custodial parent if the parents are separated and divorced, or the legal guardian if the minor is subject to guardianship. N. D. Cent. Code § 14–02.1–03.1 (1981).

sufficient.[6]  It also makes exceptions for cases in which emergency treatment prior to notice "is necessary to prevent the woman's death," both parents have already given their consent in writing, or the proper authorities are advised that the minor is a victim of sexual or physical abuse.[7]  The statute subjects a person performing an abortion in violation of its terms to criminal sanctions and to civil liability in an action brought by any person "wrongfully denied notification."[8]

---

[6] Subdivision 3 provides, in part:

"For purposes of this section, 'parent' means both parents of the pregnant woman if they are both living, one parent of the pregnant woman if only one is living or if the second one cannot be located through reasonably diligent effort, or the guardian or conservator if the pregnant woman has one."

[7] Subdivision 4 provides:

"No notice shall be required under this section if:

"(a) The attending physician certifies in the pregnant woman's medical record that the abortion is necessary to prevent the woman's death and there is insufficient time to provide the required notice; or

"(b) The abortion is authorized in writing by the person or persons who are entitled to notice; or

"(c) The pregnant minor woman declares that she is a victim of sexual abuse, neglect, or physical abuse as defined in section 626.556. Notice of that declaration shall be made to the proper authorities as provided in section 626.556, subdivision 3."

Under Minn. Stat. § 626.556 (1988), if the minor declares that she is the victim of abuse, the notified physician or physician's agent must report the abuse to the local welfare or law enforcement agency within 24 hours, §§ 626.556(3)(a), (3)(e), whereupon the welfare agency "shall immediately conduct an assessment and offer protective social services for purposes of preventing further abuses, safeguarding and enhancing the welfare of the abused or neglected minor, and preserving family life whenever possible." § 626.556(10)(a). If the agency interviews the victim, it must notify the parent of the fact of the interview at the conclusion of the investigation unless it obtains a court order. § 626.556(10)(c). Individuals who are subjects of the investigation have a right of access to the record of the investigation. § 626.556(11).

[8] Subdivision 5 provides:

"Performance of an abortion in violation of this section shall be a misdemeanor and shall be grounds for a civil action by a person wrongfully de-

Subdivision 6 authorizes a judicial bypass of the two-parent notice requirement if subdivision 2 is ever "temporarily or permanently" enjoined by judicial order. If the pregnant minor can convince "any judge of a court of competent jurisdiction" that she is "mature and capable of giving informed consent to the proposed abortion," or that an abortion without notice to both parents would be in her best interest, the court can authorize the physician to proceed without notice. The statute provides that the bypass procedure shall be confidential, that it shall be expedited, that the minor has a right to court-appointed counsel, and that she shall be afforded free access to the court "24 hours a day, seven days a week." An order denying an abortion can be appealed on an expedited basis, but an order authorizing an abortion without notification is not subject to appeal.[9]

---

nied notification. A person shall not be held liable under this section if the person establishes by written evidence that the person relied upon evidence sufficient to convince a careful and prudent person that the representations of the pregnant woman regarding information necessary to comply with this section are bona fide and true, or if the person has attempted with reasonable diligence to deliver notice, but has been unable to do so."

[9] Subdivision 6 provides:

"If subdivision 2 of this law is ever temporarily or permanently restrained or enjoined by judicial order, subdivision 2 shall be enforced as though the following paragraph were incorporated as paragraph (c) of that subdivision; provided, however, that if such temporary or permanent restraining order or injunction is ever stayed or dissolved, or otherwise ceases to have effect, subdivision 2 shall have full force and effect, without being modified by the addition to the following substitute paragraph which shall have no force or effect until or unless an injunction or restraining order is again in effect.

"(c)(i) If such a pregnant woman elects not to allow the notification of one or both of her parents or guardian or conservator, any judge of a court of competent jurisdiction shall, upon petition, or motion, and after an appropriate hearing, authorize a physician to perform the abortion if said judge determines that the pregnant women is mature and capable of giving informed consent to the proposed abortion. If said judge determines that the pregnant woman is not mature, or if the pregnant woman does not claim to be mature, the judge shall determine whether the performance of

The statute contains a severability provision, but it does not include a statement of its purposes. The Minnesota Attorney General has advised us that those purposes are apparent from the statutory text and that they "include the recognition and fostering of parent-child relationships, promoting counsel to a child in a difficult and traumatic choice, and providing for notice to those who are naturally most concerned for the child's welfare."[10] The District Court found that the primary purpose of the legislation was to protect the well-being of minors by encouraging them to discuss with their parents the decision whether to terminate their pregnancies.[11] It also found that the legislature was motivated by a

---

an abortion upon her without notification of her parents, guardian, or conservator would be in her best interests and shall authorize a physician to perform the abortion without such notification if said judge concludes that the pregnant woman's best interests would be served thereby.

"(ii) Such a pregnant woman may participate in proceedings in the court on her own behalf, and the court may appoint a guardian ad litem for her. The court shall, however, advise her that she has a right to court appointed counsel, and shall, upon her request, provide her with such counsel.

"(iii) Proceedings in the court under this section shall be confidential and shall be given such precedence over other pending matters so that the court may reach a decision promptly and without delay so as to serve the best interests of the pregnant woman. A judge of the court who conducts proceedings under this section shall make in writing specific factual findings and legal conclusions supporting the decision and shall order a record of the evidence to be maintained including the judge's own findings and conclusions.

"(iv) An expedited confidential appeal shall be available to any such pregnant woman for whom the court denies an order authorizing an abortion without notification. An order authorizing an abortion without notification shall not be subject to appeal. No filing fees shall be required of any such pregnant woman at either the trial or the appellate level. Access to the trial court for the purposes of such a petition or motion, and access to the appellate courts for purposes of making an appeal from denial of the same, shall be afforded such a pregnant woman 24 hours a day, seven days a week."

[10] Brief for Petitioner in No. 88–1309, p. 4 (hereinafter Minn. Br.); see also id., at 8–9.

[11] "The Minnesota legislature had several purposes in mind when it amended Minn. Stat. § 144.343 in 1981. The primary purpose was to pro-

desire to deter and dissuade minors from choosing to terminate their pregnancies.[12] The Attorney General, however, disclaims any reliance on this purpose.[13]

## II

This litigation was commenced on July 30, 1981, two days before the effective date of the parental notification statute. The plaintiffs include two Minnesota doctors who specialize in obstetrics and gynecology, four clinics providing abortion and contraceptive services in metropolitan areas in Minnesota, six pregnant minors representing a class of pregnant minors, and the mother of a pregnant minor. Plaintiffs alleged that the statute violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment and various provisions of the Minnesota Constitution.

Based on the allegations in their verified complaint, the District Court entered a temporary restraining order enjoin-

---

tect the well-being of minors by encouraging minors to discuss with their parents the decision whether to terminate their pregnancies. Encouraging such discussion was intended to achieve several salutory results. Parents can provide emotional support and guidance and thus forestall irrational and emotional decision-making. Parents can also provide information concerning the minor's medical history of which the minor may not be aware. Parents can also supervise post-abortion care. In addition, parents can support the minor's psychological well-being and thus mitigate adverse psychological sequelae that may attend the abortion procedure." 648 F. Supp. 756, 765–766 (Minn. 1986).

[12] The District Court's finding 59 reads as follows:

"The court finds that a desire to deter and dissuade minors from choosing to terminate their pregnancies also motivated the legislature. Testimony before a legislative committee considering the proposed notification requirement indicated that influential supporters of the measure hoped it 'would save lives' by influencing minors to carry their pregnancies to term rather than aborting." *Id.*, at 766.

[13] "The court also found that a desire to dissuade minors from choosing to terminate their pregnancies also motivated the legislature. Finding 59, Hodgson Appendix 25a. This finding was based on no more than the testimony before a legislative committee of some supporters of the act who hoped it 'would save lives.' There is no direct evidence, however, that this was the motive of any legislator." Minn. Br. 4, n. 2.

ing the enforcement of subdivision 2 of the statute. After a hearing, the court entered a preliminary injunction which still remains in effect. App. 31. The District Court refused, however, to rule on the validity of the judicial bypass procedure in advance of trial.[14]

In 1986, after a 5-week trial, the District Court concluded that both the two-parent notification requirement and the 48-hour waiting period were invalid. It further concluded that the definition of the term "parent," which is carried over into the notification requirement, was not severable from the remainder of the statute. The court declared the entire statute unconstitutional and enjoined the defendants from enforcing it.

A three-judge panel of the Court of Appeals affirmed. The court first held that a compulsory notification requirement is invalid if it does not provide the pregnant minor with the option of an alternative court procedure in which she can demonstrate either her maturity or that performance of an abortion without notification would be in her best interests. App. to Pet. for Cert. in No. 88–1125, p. 62a. Second, relying heavily on the findings of the District Court concerning the impact of a two-parent notice requirement on families in which the parents are divorced, separated, or unmarried, the panel also concluded that the unconstitutional notification requirement could not be saved by the judicial bypass. The court reasoned that a mature minor and her custodial parent are in a better position than a court to determine whether notifying the noncustodial parent would be in the child's best interests and that they should not be forced to submit to a "Hobson's choice" between an unconstitutional notice requirement and a burdensome court bypass.[15] The panel fur-

---

[14] On January 23, 1985, the court granted partial summary judgment in favor of defendants on several of the plaintiffs' claims, but reserved ruling on the constitutionality of subdivision 6 as applied until after trial.

[15] "Where the underlying notification provision is unconstitutional because with respect to children of broken families it fails to further the

ther held that the two-parent notice requirement was not severable.[16]

The panel opinion was vacated, and the Court of Appeals reheard the case en banc.   853 F. 2d 1452 (CA8 1988).   The court unanimously and summarily rejected the State's submission that the two-parent notice requirement was constitutional without any bypass procedure.   *Id.*, at 1456–1457. The majority concluded, however, that subdivision 6 of the statute was valid.   It agreed with the District Court that the development of a full factual record may demonstrate that a facially valid statute is "unconstitutional in operation," *id.*, at 1459, and that "the . . . detailed factual findings concerning the general difficulties of obtaining an abortion in Minnesota and the trauma of the bypass procedure, compared to its effectiveness, raise considerable questions about the practi-

---

state's significant interests, however, a mature minor or minor whose best interests are contrary to notifying the non-custodial parent is forced to either suffer the unconstitutional requirement or submit to the burdensome court bypass procedure.   Such a Hobson's choice fails to further any significant interest.   Just as there must be a constitutional judicial alternative to a notice requirement, so there must be a constitutional notice or consent alternative to the court bypass.

"The second reason for our conclusion that the court bypass procedure does not save the two-parent notification requirement is that where the parents are divorced, the minor and/or custodial parent, and not a court, is in the best position to determine whether notifying the non-custodial parent would be in the child's best interests.   In situations where the minor has a good relationship with the non-custodial parent but the custodial parent does not, there is nothing to prevent the minor from consulting with the non-custodial parent if she so desires.   The minor and custodial parent, however, by virtue of their major interest and superior position, should alone have the opportunity to decide to whom, if anyone, notice of the minor's abortion decision should be given."   App. to Pet. for Cert. in No. 88–1125, pp. 68a–69a (citations omitted).

[16] The panel did not reach the question of the constitutionality or severability of the mandatory 48-hour waiting period.   A concurring judge agreed with the panel that a requirement that a pregnant minor seeking an abortion notify a noncustodial parent could not withstand constitutional scrutiny and was not saved by a court bypass procedure.   *Id.*, at 72a.

cal wisdom of this statute." *Ibid.* In the majority's opinion, however, those questions were for the legislature to consider because the statute served valid state interests: the interest in "'encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child,'"[17] as well as the independent interest of the parents in the upbringing of their children.[18]

After noting that the State did not challenge the District Court's findings, *id.*, at 1462, the court concluded that these findings placed undue emphasis on one-parent and no-parent households. For even though the two-parent notice requirement may not further the interests of the pregnant minor in such cases, the rights of "best-interest" and mature minors were nevertheless protected by the bypass procedure. More importantly, "as applied to all pregnant minors, regardless of their family circumstances, the district court did not consider whether parental and family interests (as distinguished from the interests of the minor alone) justified the two-parent notice requirement." *Id.*, at 1463. The court wrote:

> "The district court enjoined the entire statute because of the impact of the two-parent notice requirement primarily upon one group of pregnant minors, without considering the effect of the bypass, or the parental and family interests which have been recognized by the Supreme Court. In concentrating upon the impact of the statute on the pregnant minor not living with both parents, and on the mature or non best-interest preg-

---

[17] 853 F. 2d, at 1460, quoting from Justice Powell's opinion in *Bellotti* v. *Baird*, 443 U. S. 622, 640–641 (1979) *(Bellotti II)*.

[18] The court also suggested that the statute furthered the "state interest in providing an opportunity for parents to supply essential medical and other information to a physician," 853 F. 2d, at 1461, but the State has not argued here that that interest provides an additional basis for upholding the statute.

nant minor, the district court gave only limited consideration to the 50% or more pregnant minors who live with both parents and to pregnant minors who are immature and whose best interests may require parental involvement. The district court's determination that an undue burden on the one group renders the statute unconstitutional for all is contrary to the Supreme Court's decision that a notice-consent/bypass procedure plainly serves important state interests and is narrowly drawn to protect only those interests. . . . Considering the statute as a whole and as applied to all pregnant minors, the two-parent notice requirement does not unconstitutionally burden the minor's abortion right." *Id.*, at 1464–1465 (citation omitted).

The Court of Appeals also rejected the argument that the 48-hour waiting period imposed a significant burden on the minor's abortion right, finding that the waiting period could run concurrently with the scheduling of an appointment for the procedure. Accordingly, the court reversed the judgment of the District Court without reaching the question of severability.[19]

In dissent, two members of the court criticized the majority for ignoring "the evidence amassed in a five-week trial," for relying on the judicial bypass procedure "to uphold an unconstitutional two-parent notification requirement," and for creating "a new right, apparently of constitutional dimension, for non-custodial parents to receive notice of their minor children's activities." *Id.*, at 1466. One of the dissenters joined a third dissenter in expressing the opinion that "a single-parent notification requirement would withstand constitutional challenge." *Id.*, at 1472. We granted certiorari, 492 U. S. 917 (1989).

---

[19] The court also rejected the argument that the statute violated the Equal Protection Clause by singling out abortion as the only pregnancy-related medical procedure requiring notification. *Id.*, at 1466. The equal protection challenge is not renewed here.

## III

There is a natural difference between men and women: Only women have the capacity to bear children. A woman's decision to conceive or to bear a child is a component of her liberty that is protected by the Due Process Clause of the Fourteenth Amendment to the Constitution. See *Harris* v. *McRae*, 448 U. S. 297, 316–318 (1980); *Carey* v. *Population Services International*, 431 U. S. 678, 685, 687 (1977); *Cleveland Bd. of Education* v. *LaFleur*, 414 U. S. 632, 639–640 (1974); *Roe* v. *Wade*, 410 U. S. 113, 152–153 (1973); *id.*, at 168–170 (Stewart, J., concurring); *Eisenstadt* v. *Baird*, 405 U. S. 438, 453 (1972); *Griswold* v. *Connecticut*, 381 U. S. 479, 502–503 (1965) (WHITE, J., concurring in judgment). That Clause, as interpreted in those cases, protects the woman's right to make such decisions independently and privately, see *Whalen* v. *Roe*, 429 U. S. 589, 598–600, and n. 23 (1977), free of unwarranted governmental intrusion.

> "Moreover, the potentially severe detriment facing a pregnant woman, see *Roe* v. *Wade*, 410 U. S., at 153, is not mitigated by her minority. Indeed, considering her probable education, employment skills, financial resources, and emotional maturity, unwanted motherhood may be exceptionally burdensome for a minor. In addition, the fact of having a child brings with it adult legal responsibility, for parenthood, like attainment of the age of majority, is one of the traditional criteria for the termination of the legal disabilities of minority. In sum, there are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible." *Bellotti* v. *Baird*, 443 U. S. 622, 642 (1979) *(Bellotti II)* (opinion of Powell, J.).

As we stated in *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52, 74 (1976), the right to make this decision "do[es] not mature and come into being magically only when

one attains the state-defined age of majority." Thus, the constitutional protection against unjustified state intrusion into the process of deciding whether or not to bear a child extends to pregnant minors as well as adult women.

In cases involving abortion, as in cases involving the right to travel or the right to marry, the identification of the constitutionally protected interest is merely the beginning of the analysis. State regulation of travel and of marriage is obviously permissible even though a State may not categorically exclude nonresidents from its borders, *Shapiro* v. *Thompson*, 394 U. S. 618, 631 (1969), or deny prisoners the right to marry, *Turner* v. *Safley*, 482 U. S. 78, 94–99 (1987). But the regulation of constitutionally protected decisions, such as where a person shall reside or whom he or she shall marry, must be predicated on legitimate state concerns other than disagreement with the choice the individual has made. Cf. *Turner* v. *Safley, supra; Loving* v. *Virginia*, 388 U. S. 1, 12 (1967). In the abortion area, a State may have no obligation to spend its own money, or use its own facilities, to subsidize nontherapeutic abortions for minors or adults. See, *e. g., Maher* v. *Roe*, 432 U. S. 464 (1977); cf. *Webster* v. *Reproductive Health Services*, 492 U. S. 490, 508–511 (1989); *id.*, at 523–524 (O'CONNOR, J., concurring in part and concurring in judgment). A State's value judgment favoring childbirth over abortion may provide adequate support for decisions involving such allocation of public funds, but not for simply substituting a state decision for an individual decision that a woman has a right to make for herself. Otherwise, the interest in liberty protected by the Due Process Clause would be a nullity. A state policy favoring childbirth over abortion is not in itself a sufficient justification for overriding the woman's decision or for placing "obstacles—absolute or otherwise—in the pregnant woman's path to an abortion." *Maher*, 432 U. S., at 474; see also *Harris* v. *McRae*, 448 U. S., at 315–316.

In these cases the State of Minnesota does not rest its defense of this statute on any such value judgment. Indeed, it affirmatively disavows that state interest as a basis for upholding this law.[20] Moreover, it is clear that the state judges who have interpreted the statute in over 3,000 decisions implementing its bypass procedures have found no legislative intent to disfavor the decision to terminate a pregnancy. On the contrary, in all but a handful of cases they have approved such decisions.[21] Because the Minnesota statute unquestionably places obstacles in the pregnant minor's path to an abortion, the State has the burden of establishing its constitutionality. Under any analysis, the Minnesota statute cannot be sustained if the obstacles it imposes are not reasonably related to legitimate state interests. Cf. *Turner* v. *Safley*, 482 U. S., at 97; *Carey* v. *Population Services International*, 431 U. S., at 704 (opinion of Powell, J.); *Doe* v. *Bolton*, 410 U. S. 179, 194–195, 199 (1973).

IV

The Court has considered the constitutionality of statutes providing for parental consent or parental notification in six abortion cases decided during the last 14 years.[22] Although the Massachusetts statute reviewed in *Bellotti* v. *Baird*, 428 U. S. 132 (1976) *(Bellotti I)*, and *Bellotti II* required the consent of both parents, and the Utah statute reviewed in *H. L.*

---

[20] See n. 14, *supra*.

[21] The District Court found:

"During the period for which statistics have been compiled, 3,573 bypass petitions were filed in Minnesota courts. Six petitions were withdrawn before decision. Nine petitions were denied and 3,558 were granted." Finding No. 55, 648 F. Supp., at 765.

[22] *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52, 72–75 (1976); *Bellotti* v. *Baird*, 428 U. S. 132 (1976) *(Bellotti I); Bellotti II*, 443 U. S. 622 (1979); *H. L.* v. *Matheson*, 450 U. S. 398 (1981); *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 439–442 (1983); and *Planned Parenthood Assn. of Kansas City, Mo., Inc.* v. *Ashcroft*, 462 U. S. 476, 490–493 (1983); *id.*, at 505 (O'CONNOR, J., concurring in judgment in part and dissenting in part).

v. *Matheson*, 450 U. S. 398 (1981), required notice to "the parents,"[23] none of the opinions in any of those cases focused on the possible significance of making the consent or the notice requirement applicable to both parents instead of just one. In contrast, the arguments in these cases, as well as the extensive findings of the District Court, are directed primarily at that distinction. It is therefore appropriate to summarize these findings before addressing the constitutionality of the 48-hour waiting period or the two-parent notification requirement, particularly since none of the findings has been challenged in either this Court or the Court of Appeals.

Approximately one out of every two marriages ends in divorce. 648 F. Supp. 756, 768 (Minn. 1986). Unrebutted evidence indicates that only 50% of minors in the State of Minnesota reside with both biological parents. *Ibid.;* App. 125–126. This conclusion is substantially corroborated by a study indicating that 9% of the minors in Minnesota live with neither parent and 33% live with only one parent. 648 F. Supp., at 768.[24]

---

[23] The Utah statute reviewed in *Matheson* required the physician to "[n]otify, if possible, the parents or guardian of the woman upon whom the abortion is to be performed." Utah Code Ann. § 76–7–304(2) (1990). Unlike the Minnesota statute under review today, the Utah statute did not define the term "parents." The statute is ambiguous as to whether the term refers to each parent individually or rather to the parental unit, which could be represented by either the mother or the father, and neither the argument nor the discussion in *Matheson* indicated that notice to both parents was required. State law, to the extent it addresses the issue, is to the contrary: Although Utah law provides that a noncustodial parent retains the right to consent to marriage, enlistment, and the performance of major medical or surgical treatment, the right to notice of the minor's abortion is not among the parent's specific residual rights and duties. Utah Code Ann. § 78–3a–2(13) (Supp. 1989).

[24] The figures are not dissimilar to those throughout the Nation. See, *e. g.*, Brief for American Psychological Association et al. as *Amici Curiae* 12–13 ("It is estimated that by age 17, 70 percent of white children born in 1980 will have spent at least some time with only one parent, and 94 percent of black children will have lived in one-parent homes") (citing

The District Court found—on the basis of extensive testimony at trial—that the two-parent notification requirement had particularly harmful effects on both the minor and the custodial parent when the parents were divorced or separated. Relations between the minor and absent parent were not reestablished as a result of the forced notification, thereby often producing disappointment in the minor "when an anticipated reestablishment of her relationship with the absent parent d[id] not occur." *Id.*, at 769. Moreover, "[t]he reaction of the custodial parent to the requirement of forced notification is often one of anger, resentment and frustration at the intrusion of the absent parent," *ibid.*, and fear that notification will threaten the custody rights of the parent or otherwise promote intrafamily violence. Tragically, those fears were often realized:

> "Involuntary involvement of the second biological parent is especially detrimental when the minor comes from an abusive, dysfunctional family. Notification of the minor's pregnancy and abortion decision can provoke violence, even where the parents are divorced or separated. Studies have shown that violence and harassment may continue well beyond the divorce, especially when children are involved.
>
> ". . . Furthermore, a mother's perception in a dysfunctional family that there will be violence if the father learns of the daughter's pregnancy is likely to be an accurate perception." *Ibid.*

The District Court further found:

> "Twenty to twenty-five percent of the minors who go to court either are accompanied by one parent who knows and consents to the abortion or have already told one parent of their intent to terminate their pregnancy. The vast majority of these voluntarily informed parents

Hofferth, Updating Children's Life Course, 47 J. Marriage and Fam. 93 (1985)).

are women who are divorced or separated from spouses whom they have not seen in years. Going to court to avoid notifying the other parent burdens the privacy of both the minor and the accompanying parent. The custodial parents are angry that their consent is not sufficient and fear that notification will bring the absent parent back into the family in an intrusive and abusive way." *Ibid.*

The District Court also found that the two-parent notification requirement had adverse effects in families in which the minor lives with both parents. These effects were particularly pronounced in the distressingly large number of cases in which family violence is a serious problem. The court found that many minors in Minnesota "live in fear of violence by family members" and "are, in fact, victims of rape, incest, neglect and violence."[25] The District Court found that few minors can take advantage of the exception for a minor who declares that she is a victim of sexual or physical abuse because of the obligation to report the information to the authorities and the attendant loss of privacy. See Findings 46 and 47,

---

[25] "Studies indicating that family violence occurs in two million families in the United States substantially underestimate the actual number of such families. In Minnesota alone, reports indicate that there are an average of 31,200 incidents of assault on women by their partners each year. Based on these statistics, state officials suggest that the 'battering' of women by their partners 'has come to be recognized as perhaps the most frequently committed violent crime in the state' of Minnesota. These numbers do not include incidents of psychological or sexual abuse, low-level physical abuse, abuse of any sort of the child of a batterer, or those incidents which are not reported. Many minors in Minnesota live in fear of violence by family members; many of them are, in fact, victims of rape, incest, neglect and violence. It is impossible to accurately assess the magnitude of the problem of family violence in Minnesota because members of dysfunctional families are characteristically secretive about such matters and minors are particularly reluctant to reveal violence or abuse in their families. Thus the incidence of such family violence is dramatically underreported." 648 F. Supp., at 768–769.

648 F. Supp., at 764.[26]   This concern about family violence helps to explain why the District Court found that in many instances the requirement that both parents be notified actually impairs family communication.   Minors who otherwise would inform one parent were unwilling to do so when such notification likely would also involve the parent in the torturous ordeal of explaining to a court why the second parent should not be notified.   The court found:

> "Minors who ordinarily would notify one parent may be dissuaded from doing so by the two-parent requirement.   A minor who must go to court for authorization in any event may elect not to tell either parent.   In these instances, the requirement that minors notify both biological parents actually reduces parent-child communication."   *Id.*, at 769.[27]

The great majority of bypass petitions are filed in the three metropolitan counties in Minnesota, where courts schedule bypass hearings on a regular basis and have in place procedures for hearing emergency petitions.   *Id.*, at 762.   Courts in the nonmetropolitan areas are acquainted with the statute and, for the most part, apply it conscientiously, but a number of counties are served by judges who are unwilling to hear bypass petitions.   *Id.*, at 763.   Aside from the unavoidable

---

[26] "Minors who are victims of sexual or physical abuse often are reluctant to reveal the existence of the abuse to those outside the home.   More importantly, notification to government authorities creates a substantial risk that the confidentiality of the minor's decision to terminate her pregnancy will be lost.   Thus, few minors choose to declare they are victims of sexual or physical abuse despite the prevalence of such abuse in Minnesota, as elsewhere."   *Id.*, at 764.

[27] As one of the guardians ad litem testified: "We have had situations reported to me by my other guardians as well as teenagers that I talked to myself who have said that they will consider telling one parent, usually mom, sometimes dad, but since they would have to go to court anyway, because they are absolutely sure they don't want the other parent to know, they don't tell either one."   App. 239 (Testimony of Susanne Smith).

notification of court officials, the confidentiality of minors has been maintained.  *Ibid.*

During the period between August 1, 1981, and March 1, 1986, 3,573 judicial bypass petitions were filed in Minnesota courts.  All but 15 were granted.[28]  The judges who adjudicated over 90% of these petitions testified; none of them identified any positive effects of the law.[29]  The court experience produced fear, tension, anxiety, and shame among minors,

---

[28] See n. 21, *supra.*

[29] One testified that minors found the bypass procedure " 'a very nerve-racking experience,' " Finding 60, 648 F. Supp., at 766; another testified that the minor's " 'level of apprehension is twice what I normally see in court.' "  *Ibid.*  A Massachusetts judge who heard similar petitions in that State expressed the opinion that "going to court was 'absolutely' traumatic for minors . . . 'at a very, very difficult time in their lives.' "  *Ibid.*  One judge stated that he did not "perceive any useful public purpose to what I am doing in these cases" and that he did not "see anything that is being accomplished that is useful to anybody."  Testimony of Gerald C. Martin, App. in No. 86–5423 (CA8), pp. A–488—A–489.

The public defenders and guardians ad litem gave similar testimony. See Testimony of Cynthia Daly (public defender), App. 187 (bypass "was another hoop to jump through and a very damaging and stress-producing procedure that didn't do any good"); Testimony of Susanne Smith (guardian ad litem), *id.*, at 234 ("The teenagers that we see in the guardian's office are very nervous, very scared.  Some of them are terrified about court processes.  They are often exhausted. . . . They are upset about and tell us that they are upset about the fact that they have to explain very intimate details of their personal lives to strangers.  They talk about feeling that they don't belong in the court system, that they are ashamed, embarrassed and somehow that they are being punished for the situation they are in"); Testimony of Heather Sweetland (public defender), App. in No. 86–5423 (CA8), p. A–585 ("Most of the women that are my clients in these hearings are scared . . . .  Some of them will relax slightly but the majority of them are very nervous").

Doctor Hodgson, one of the plaintiffs in this case, testified that when her minor patients returned from the court process, "some of them are wringing wet with perspiration.  They're markedly relieved, many of them. They—they dread the court procedure often more than the actual abortion procedure.  And it—it's frequently necessary to give them a sedative of some kind beforehand."  App. 468.

causing some who were mature, and some whose best interests would have been served by an abortion, to "forego the bypass option and either notify their parents or carry to term." Finding 44, 648 F. Supp., at 763. Among parents who supported their daughters in the bypass proceedings, the court experience evoked similar reactions.[30]

Scheduling petitions in the Minnesota court typically required minors to wait only two or three days for hearings. The District Court found, however, that the statutory waiting period of 48 hours was frequently compounded by a number of other factors that "commonly" created a delay of 72 hours, *id.*, at 764–765, and, "in many cases" a delay of a week or more in effecting a decision to terminate a pregnancy. *Id.*, at 765. A delay of that magnitude increased the medical risk associated with the abortion procedure to "a statistically significant degree." Finding 43, 648 F. Supp., at 763. While recognizing that a mandatory delay following the notice to a minor's parent served the State's interest in protecting pregnant minors, the court found that that interest could be served by a shorter waiting period. *Id.*, at 779–780.

At least 37 witnesses testified to the issue whether the statute furthered the State's interest in protecting pregnant minors. Only two witnesses testified that a two-parent notification statute did minors more good than harm; neither of these witnesses had direct experience with the Minnesota statute. Summarizing its findings on the question whether the statute as a whole furthered the State's interests, the District Court wrote:

> "Of the remaining witnesses who spoke to the issue whether Minn. Stat. § 144.343 effectuates the State's interest in protecting pregnant minors, all but four of

---

[30] According to the testimony at trial, parents who participated in the bypass procedure—many of whom had never before been in court—were "real upset" about having to appear in court, *id.*, at 167, and were "angry, they were worried about their kid and they were nervous too." *Id.*, at 186.

these are personally involved in the statute's implementation in Minnesota. They are judges, public defenders, guardians ad litem, and clinic counselors. None of these witnesses testified that the statute has a beneficial effect upon the minors whom it affects. Some testified the law has a negligible [e]ffect upon intra-family communication and upon the minors' decision-making process. Others testified the statute has a deleterious effect on the well-being of the minors to whom it applies because it increases the stress attendant to the abortion decision without creating any corresponding benefit. Thus five weeks of trial have produced no factual basis upon which this court can find that Minn. Stat. § 144.343(2)–(7) on the whole furthers in any meaningful way the state's interest in protecting pregnant minors or assuring family integrity." *Id.*, at 775.

Focusing specifically on the statutory requirement that both parents be notified, the District Court concluded:

"The court finds that this requirement places a significant burden upon pregnant minors who do not live with both parents. Particularly in these cases, notification of an abusive, or even a disinterested, absent parent has the effect of reintroducing that parent's disruptive or unhelpful participation into the family at a time of acute stress. Similarly, the two-parent notification requirement places a significant obstacle in the path of minors in two parent homes who voluntarily have consulted with one parent but not with the other out of fear of psychological, sexual, or physical abuse toward either the minor or the notified parent. In either case, the alternative of going to court to seek authorization to proceed without notifying the second parent introduces a traumatic distraction into her relationship with the parent whom the minor has notified. The anxiety attending either option tends to interfere with and burden the parent-child com-

munication the minor voluntarily initiated with the custodial parent.

.        .        .        .        .

". . . Indeed, 20 to 25% of minors seeking judicial authorization to proceed with an abortion without parental notification are accompanied to court by one parent, or at least have obtained the approval of one parent.   In these cases the necessity either to notify the second parent despite the agreement of both the minor and the notified parent that such notification is undesirable, or to obtain a judicial waiver of the notification requirement, distracts the minor and her parent and disrupts their communication.   Thus the need to notify the second parent or to make a burdensome court appearance actively interferes with the parent-child communication voluntarily initiated by the child, communication assertedly at the heart of the State's purpose in requiring notification of both parents.   In these cases, requiring notification of both parents affirmatively discourages parent-child communication." *Id.*, at 777–778.

## V

Three separate but related interests—the interest in the welfare of the pregnant minor, the interest of the parents, and the interest of the family unit—are relevant to our consideration of the constitutionality of the 48-hour waiting period and the two-parent notification requirement.

The State has a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely.   See *Bellotti II*, 443 U. S., at 634–639 (opinion of Powell, J.); *Prince* v. *Massachusetts*, 321 U. S. 158, 166–167 (1944).[31]   That interest, which justifies

---

[31] "Properly understood . . . the tradition of parental authority is not inconsistent with our tradition of individual liberty; rather, the former is one of the basic presuppositions of the latter.   Legal restrictions on minors,

state-imposed requirements that a minor obtain his or her parent's consent before undergoing an operation, marrying, or entering military service, see *Parham* v. *J. R.*, 442 U. S. 584, 603–604 (1979); *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S., at 95 (WHITE, J., concurring in part and dissenting in part); *id.*, at 102–103 (STEVENS, J., concurring in part and dissenting in part), extends also to the minor's decision to terminate her pregnancy. Although the Court has held that parents may not exercise "an absolute, and possibly arbitrary, veto" over that decision, *Danforth*, 428 U. S., at 74, it has never challenged a State's reasonable judgment that the decision should be made after notification to and consultation with a parent. See *Ohio* v. *Akron Center for Reproductive Health, post*, at 510–511; *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 428, n. 10, 439 (1983); *H. L.* v. *Matheson*, 450 U. S., at 409–410; *Bellotti II*, 443 U. S., at 640–641 (opinion of Powell, J.); *Danforth*, 428 U. S., at 75. As Justice Stewart, joined by Justice Powell, pointed out in his concurrence in *Danforth:*

> "There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child." *Id.*, at 91.

Parents have an interest in controlling the education and upbringing of their children but that interest is "a counterpart of the responsibilities they have assumed." *Lehr* v. *Robertson*, 463 U. S. 248, 257 (1983); see also *Parham*, 442 U. S., at 602 (citing 1 W. Blackstone, Commentaries *447;

especially those supportive of the parental role, may be important to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding." *Bellotti II*, 443 U. S., at 638–639 (opinion of Powell, J.).

See also *Stanford* v. *Kentucky*, 492 U. S. 361, 394–396 (1989) (BRENNAN, J., dissenting); *Thompson* v. *Oklahoma*, 487 U. S. 815, 825–826, n. 23 (1988) (plurality opinion).

2 J. Kent, Commentaries on American Law *190); *Pierce* v. *Society of Sisters*, 268 U. S. 510, 535 (1925). The fact of biological parentage generally offers a person only "an opportunity . . . to develop a relationship with his offspring." *Lehr*, 463 U. S., at 262; see also *Caban* v. *Mohammed*, 441 U. S. 380, 397 (1979) (Stewart, J., dissenting). But the demonstration of commitment to the child through the assumption of personal, financial, or custodial responsibility may give the natural parent a stake in the relationship with the child rising to the level of a liberty interest. See *Stanley* v. *Illinois*, 405 U. S. 645, 651 (1972); *Lehr*, 463 U. S., at 261; *Michael H.* v. *Gerald D.*, 491 U. S. 110, 157–160 (1989) (WHITE, J., dissenting); cf. *Caban*, 441 U. S., at 393, n. 14. But see *Michael H.*, 491 U. S., at 123–127 (plurality opinion).

While the State has a legitimate interest in the creation and dissolution of the marriage contract, see *Sosna* v. *Iowa*, 419 U. S. 393, 404 (1975); *Maynard* v. *Hill*, 125 U. S. 190, 205 (1888), the family has a privacy interest in the upbringing and education of children and the intimacies of the marital relationship which is protected by the Constitution against undue state interference. See *Wisconsin* v. *Yoder*, 406 U. S. 205, 233–234 (1972); *Griswold* v. *Connecticut*, 381 U. S., at 495–496 (Goldberg, J., concurring); *Poe* v. *Ullman*, 367 U. S. 497, 551–552 (1961) (Harlan, J., dissenting); *Gilbert* v. *Minnesota*, 254 U. S. 325, 335–336 (1920) (Brandeis, J., dissenting); see also *Michael H.*, 491 U. S., at 132 (O'CONNOR, J., concurring in part); *Roberts* v. *United States Jaycees*, 468 U. S. 609, 618–620 (1984); *Cleveland Bd. of Education* v. *LaFleur*, 414 U. S., at 639–640. The family may assign one parent to guide the children's education and the other to look after their health.[32] "The statist notion that governmental power should supersede parental authority in

---

[32] Under common-law principles, one parent has authority to act as agent for the other in matters of their child's upbringing and education. See E. Spencer, Law of Domestic Relations 432 (1911); T. Reeve, Law of Baron and Femme 295 (1816).

*all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Parham,* 442 U. S., at 603. We have long held that there exists a "private realm of family life which the state cannot enter." *Prince* v. *Massachusetts,* 321 U. S., at 166. Thus, when the government intrudes on choices concerning the arrangement of the household, this Court has carefully examined the "governmental interests advanced and the extent to which they are served by the challenged regulation." *Moore* v. *East Cleveland,* 431 U. S. 494, 499 (1977) (plurality opinion); *id.,* at 507, 510–511 (BRENNAN, J., concurring); see also *Meyer* v. *Nebraska,* 262 U. S. 390, 399–400 (1923).

A natural parent who has demonstrated sufficient commitment to his or her children is thereafter entitled to raise the children free from undue state interference. As JUSTICE WHITE explained in his opinion for the Court in *Stanley* v. *Illinois,* 405 U. S. 645 (1972):

> "The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923), 'basic civil rights of man,' *Skinner* v. *Oklahoma,* 316 U. S. 535, 541 (1942), and '[r]ights far more precious . . . than property rights,' *May* v. *Anderson,* 345 U. S. 528, 533 (1953). 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer* v. *Nebraska, supra,* at 399, the Equal Protection Clause of the Fourteenth Amendment, *Skinner* v. *Oklahoma, supra,* at 541, and the Ninth Amendment, *Griswold* v.

*Connecticut*, 381 U. S. 479, 496 (1965) (Goldberg, J., concurring)." *Id.*, at 651.[33]

## VI

We think it is clear that a requirement that a minor wait 48 hours after notifying a single parent of her intention to get an abortion would reasonably further the legitimate state interest in ensuring that the minor's decision is knowing and intelligent. We have held that when a parent or another person has assumed "primary responsibility" for a minor's well-being, the State may properly enact "laws designed to aid discharge of that responsibility." *Ginsberg* v. *New York*, 390 U. S. 629, 639 (1968). To the extent that subdivision 2 of the Minnesota statute requires notification of only one parent, it does just that. The brief waiting period provides the parent the opportunity to consult with his or her spouse and a family physician, and it permits the parent to inquire into the competency of the doctor performing the abortion, discuss the religious or moral implications of the abortion decision, and provide the daughter needed guidance and counsel in

---

[33] "Certainly the safeguarding of the home does not follow merely from the sanctity of property rights. The home derives its pre-eminence as the seat of family life. And the integrity of that life is something so fundamental that it has been found to draw to its protection the principles of more than one explicitly granted Constitutional right." *Poe* v. *Ullman*, 367 U. S. 497, 551–552 (1961) (Harlan, J., dissenting).

Far more than contraceptives, at issue in *Poe* and *Griswold* v. *Connecticut*, 381 U. S. 479 (1965), the married couple has a well-recognized interest in protecting the sanctity of their communications from undue interference by the State. See, *e. g.*, *Stein* v. *Bowman*, 13 Pet. 209, 223 (1839) ("This rule is founded upon the deepest and soundest principles of our nature. Principles which have grown out of those domestic relations, that constitute the basis of civil society; and which are essential to the enjoyment of that confidence which should subsist between those who are connected by the nearest and dearest relations of life. To break down or impair the great principles which protect the sanctities of husband and wife, would be to destroy the best solace of human existence"); 2 W. Best, Principles of Law of Evidence 994–995 (1st Am. ed. 1876); 1 S. Greenleaf, Law of Evidence 286–287 (12th ed. 1866); 1 M. Phillips, Law of Evidence 69–80 (3d ed. 1849).

evaluating the impact of the decision on her future. See *Zbaraz* v. *Hartigan*, 763 F. 2d 1532, 1552 (CA7 1985) (Coffey, J., dissenting), aff'd by an equally divided Court, 484 U. S. 171 (1987).

The 48-hour delay imposes only a minimal burden on the right of the minor to decide whether or not to terminate her pregnancy. Although the District Court found that scheduling factors, weather, and the minor's school and work commitments may combine, in many cases, to create a delay of a week or longer between the initiation of notification and the abortion, 648 F. Supp., at 765, there is no evidence that the 48-hour period itself is unreasonable or longer than appropriate for adequate consultation between parent and child. The statute does not impose any period of delay once a court, acting *in loco parentis*, or the parents express their agreement that the minor is mature or that the procedure would be in her best interest. Indeed, as the Court of Appeals noted and the record reveals,[34] the 48-hour waiting period may run concurrently with the time necessary to make an appointment for the procedure, thus resulting in little or no delay.[35]

---

[34] The record contains the telephone training manual of one clinic which contemplates that notification will be made on the date the patient contacts the clinic to arrange an abortion so that the appointment can be scheduled for a few days later. Since that clinic typically has a 1- to 2-day backlog, App. 146–147, the statutory waiting period creates little delay.

[35] *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S., at 449, upon which the plaintiffs rely, is not to the contrary. There we invalidated a provision that required that mature women, capable of consenting to an abortion, wait 24 hours after giving consent before undergoing an abortion. The only legitimate state interest asserted was that the "woman's decision be informed." *Id.*, at 450. We decided that "if a woman, after appropriate counseling, is prepared to give her written informed consent and proceed with the abortion, a State may not demand that she delay the effectuation of that decision." *Id.*, at 450–451. By contrast, in this case, the State asserts a legitimate interest in protecting minor women from their own immaturity. As we explain in the text, the right of the minor to make an informed decision to terminate her pregnancy is not defeated by the 48-hour waiting period. It is significant that the statute

## VII

It is equally clear that the requirement that *both* parents be notified, whether or not both wish to be notified or have assumed responsibility for the upbringing of the child, does not reasonably further any legitimate state interest. The usual justification for a parental consent or notification provision is that it supports the authority of a parent who is presumed to act in the minor's best interest and thereby assures that the minor's decision to terminate her pregnancy is knowing, intelligent, and deliberate. To the extent that such an interest is legitimate, it would be fully served by a requirement that the minor notify one parent who can then seek the counsel of his or her mate or any other party, when such advice and support is deemed necessary to help the child make a difficult decision. In the ideal family setting, of course, notice to either parent would normally constitute notice to both. A statute requiring two-parent notification would not further any state interest in those instances. In many families, however, the parent notified by the child would not notify the other parent. In those cases the State has no legitimate interest in questioning one parent's judgment that notice to the other parent would not assist the minor or in presuming that the parent who has assumed parental duties is incompetent to make decisions regarding the health and welfare of the child.

Not only does two-parent notification fail to serve any state interest with respect to functioning families, it disserves the state interest in protecting and assisting the minor with respect to dysfunctional families. The record reveals that in the thousands of dysfunctional families affected by this statute, the two-parent notice requirement proved positively harmful to the minor and her family. The testimony

---

does not impose a waiting period if a substitute *competent* decisionmaker—a parent or court—gives affirmative consent to the abortion.

at trial established that this requirement, ostensibly designed for the benefit of the minor, resulted in major trauma to the child, and often to a parent as well. In some cases, the parents were divorced and the second parent did not have custody or otherwise participate in the child's upbringing. App. 244–245; *id.*, at 466; *id.*, at 115. In these circumstances, the privacy of the parent and child was violated, even when they suffered no other physical or psychological harm. In other instances, however, the second parent had either deserted or abused the child, *id.*, at 462, 464, had died under tragic circumstances, *id.*, at 120–121, or was not notified because of the considered judgment that notification would inflict unnecessary stress on a parent who was ill. *Id.*, at 204, 465.[36] In these circumstances, the statute was not merely ineffectual in achieving the State's goals but actually counterproductive. The focus on notifying the second parent distracted both the parent and minor from the minor's imminent abortion decision.

The State does not rely primarily on the best interests of the minor in defending this statute. Rather, it argues that, in the ideal family, the minor should make her decision only

---

[36] The most common reason for not notifying the second parent was that that parent was a child- or spouse-batterer, App. 204, and notification would have provoked further abuse. For example, Judge Allen Oleisky, whose familiarity with the Minnesota statute is based on his having heard over 1,000 petitions from minors, *id.*, at 154, testified that battering is a frequent crime in Minnesota, that parents seek an exemption from the notification requirement because they have been battered or are afraid of assault, and that notification of the father would "set the whole thing off again in some cases." *Id.*, at 166–167. See also *id.*, at 237, 245, 339. That testimony is confirmed by the uncontradicted testimony of one of plaintiffs' experts that notice of a daughter's pregnancy "would absolutely enrage [a batterer]. It would be much like showing a red cape to a bull. That kind of information just plays right into his worst fears and his most vulnerable spots. The sexual jealousy, his dislike of his daughter going out with anybody else, would make him very angry and would probably create severe abuse as well as long term communication difficulties." *Id.*, at 194 (testimony of Lenore Walker).

after consultation with both parents who should naturally be concerned with the child's welfare and that the State has an interest in protecting the independent right of the parents "to determine and strive for what they believe to be best for their children." Minn. Br. 26. Neither of these reasons can justify the two-parent notification requirement. The second parent may well have an interest in the minor's abortion decision, making full communication among all members of a family desirable in some cases, but such communication may not be decreed by the State. The State has no more interest in requiring all family members to talk with one another than it has in requiring certain of them to live together. In *Moore v. East Cleveland*, 431 U. S. 494 (1977), we invalidated a zoning ordinance which "slic[ed] deeply into the family itself," *id.*, at 498, permitting the city to "standardiz[e] its children — and its adults — by forcing all to live in certain narrowly defined family patterns." *Id.*, at 506. Although the ordinance was supported by state interests other than the State's interest in substituting its conception of family life for the family's own view, the ordinance's relation to those state interests was too "tenuous" to satisfy constitutional standards. By implication, a state interest in standardizing its children and adults, making the "private realm of family life" conform to some state-designed ideal, is not a legitimate state interest at all. See also *Meyer v. Nebraska*, 262 U. S., at 399–400 (right to establish a home and bring up children may not be interfered with by legislative action which is without "reasonable relation to some purpose within the competency of the State to effect").

Nor can any state interest in protecting a parent's interest in shaping a child's values and lifestyle overcome the liberty interests of a minor acting with the consent of a single parent or court. See *Bellotti II*, 443 U. S. 622 (1979); *Bellotti I*, 428 U. S. 132 (1976); *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52 (1976). In *Danforth*, the majority identified the only state interest in requiring parental con-

sent as that in "the safeguarding of the family unit and of parental authority" and held that that state interest was insufficient to support the requirement that mature minors receive parental consent. The Court summarily concluded that "[a]ny independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy of the competent minor mature enough to have become pregnant." *Id.*, at 75. It follows that the combined force of the separate interest of one parent and the minor's privacy interest must outweigh the separate interest of the second parent.

In *Bellotti I* and *Bellotti II*, we also identified the difference between parental interests and the child's best interest. Although the District Court invalidated the Massachusetts statute there under review on the grounds that it permitted a parent or the court, acting *in loco parentis*, to refuse consent based on the parent's own interests, the state attorney general argued that the parental right consisted " 'exclusively of the right to assess independently, for their minor child, what will serve that child's best interest.' " 428 U. S., at 144. Because we believed that the attorney general's interpretation "would avoid or substantially modify the federal constitutional challenge," *id.*, at 148, we ordered the District Court to certify the state-law question to the Supreme Judicial Court of Massachusetts. *Id.*, at 151–152. On review in this Court for the second time, after the Supreme Judicial Court stated unambiguously that the "good cause" standard required the judge to grant consent to an abortion found to be in the minor's best interest, 443 U. S., at 630, 644 (opinion of Powell, J.), we confirmed that such a construction satisfied "some of the concerns" about the statute's constitutionality, *id.*, at 644, and thereby avoided "much of what was objectionable in the statute successfully challenged in *Danforth*," *id.*, at 645. Indeed, the constitutional defects that Justice Powell identified in the statute—its failure to allow a minor who is found to be mature and fully competent to make the abortion

decision independently and its requirement of parental consultation even when an abortion without notification would be in the minor's best interests — are predicated on the assumption that the justification for any rule requiring parental involvement in the abortion decision rests entirely on the best interests of the child. *Id.*, at 651.[37]

Unsurprisingly, the Minnesota two-parent notification requirement is an oddity among state and federal consent provisions governing the health, welfare, and education of children. A minor desiring to enlist in the armed services or the Reserve Officers' Training Corps (ROTC) need only obtain the consent of "his parent or guardian." 10 U. S. C. §§ 505(a), 2104(b)(4), 2107(b)(4). The consent of "*a* parent or guardian" is also sufficient to obtain a passport for foreign travel from the United States Department of State, 22 CFR § 51.27 (1989) (emphasis added), and to participate as a subject in most forms of medical research, 45 CFR §§ 46.404, 46.405 (1988). In virtually every State, the consent of one parent is enough to obtain a driver's license or operator's permit. The same may be said with respect to the decision to submit to any medical or surgical procedure other than an abortion.[38] Indeed, the only other Minnesota statute that the State has identified which requires two-parent con-

---

[37] JUSTICE KENNEDY recognizes that parental rights are coupled with parental responsibilities, *post*, at 483, and that "a State [may] legislate on the premise that parents, as a general rule, are interested in their children's welfare and will act in accord with it," *post*, at 485. That, of course, is precisely our point. What the State may not do is legislate on the generalized assumptions that a parent in an intact family will not act in his or her child's best interests and will fail to involve the other parent in the child's upbringing when that involvement is appropriate.

[38] See, *e. g.*, Brief for American Psychological Association et al. as *Amici Curiae* 6, n. 8 (state law typically allows a minor parent — whatever her age — to consent to the health care of her child); Brief for the American College of Obstetricians and Gynecologists et al. as *Amici Curiae* 25 ("In areas that do not deal with sexuality or substance abuse, states require, at most, a single parent's consent before performing medical procedures on a minor").

sent is that authorizing the minor to change his name. Tr. of Oral Arg. 30, 32; Reply Brief for Petitioner in No. 88–1309, p. 5 (citing Minn. Stat. § 259.10 (1988)). These statutes provide testimony to the unreasonableness of the Minnesota two-parent notification requirement and to the ease with which the State can adopt less burdensome means to protect the minor's welfare. Cf. *Clark* v. *Jeter*, 486 U. S. 456, 464 (1988); *Turner* v. *Safley*, 482 U. S., at 98. We therefore hold that this requirement violates the Constitution.

## VIII

The Court holds that the constitutional objection to the two-parent notice requirement is removed by the judicial bypass option provided in subdivision 6 of the Minnesota statute. I respectfully dissent from that holding.

A majority of the Court has previously held that a statute requiring one parent's consent to a minor's abortion will be upheld if the State provides an "'alternative procedure whereby a pregnant minor may demonstrate that she is sufficiently mature to make the abortion decision herself or that, despite her immaturity, an abortion would be in her best interests.'" *Planned Parenthood Assn. of Kansas City, Mo., Inc.* v. *Ashcroft*, 462 U. S. 476, 491 (1983) (opinion of Powell, J.); *id.*, at 505 (opinion of O'CONNOR, J.). Indeed, in *Bellotti II*, four Members of the Court expressed the same opinion about a statute requiring the consent of both parents. See 443 U. S., at 643–644 (opinion of Powell, J.). Neither of those precedents should control our decision today.

In *Bellotti II*, eight Members of the Court joined the judgment holding the Massachusetts statute unconstitutional. Thus, the Court did not *hold* that the judicial bypass set forth in that statute was valid; it held just the opposite. Moreover, the discussion of the minimum requirements for a valid judicial bypass in Justice Powell's opinion was joined by only three other Members of the Court. Indeed, neither the arguments of the parties, nor any of the opinions in the case,

considered the significant difference between a statute requiring the involvement of *both* parents in the abortion decision and a statute that merely requires the involvement of one.   Thus, the doctrine of *stare decisis* does not require that the standards articulated in Justice Powell's opinion be applied to a statute that mandates the involvement of both parents.

Unlike *Bellotti II*, the judgment in *Ashcroft* sustained the constitutionality of the statute containing a judicial bypass as an alternative to the requirement of *one* parent's consent to a minor's abortion.   The distinctions between notice and consent and between notification of both parents rather than just one arguably constitute a sufficient response to an argument resting on *stare decisis*.   Further analysis is necessary, however, because, at least on the surface, the consent requirement would appear to be more onerous than a requirement of mere notice.

The significance of the distinction between a statute requiring the consent of one parent and a statute requiring notice to both parents must be tested by the relationship of the respective requirements to legitimate state interests.   We have concluded that the State has a strong and legitimate interest in providing a pregnant minor with the advice and support of a parent during the decisional period.   A general rule requiring the minor to obtain the consent of one parent reasonably furthers that interest.   An exception from the general rule is necessary to protect the minor from an arbitrary veto that is motivated by the separate concerns of the parent rather than the best interest of the child.   Cf. *Parham* v. *J. R.*, 442 U. S., at 604–608.   But the need for an exception does not undermine the conclusion that the general rule is perfectly reasonable—just as a rule requiring the consent of either parent for any other medical procedure would surely be reasonable if an exception were made for those emergencies in which, for example, a parent might deny lifesaving

treatment to a child on religious grounds. See *id.*, at 602–603.

For reasons already set forth at length, a rule requiring consent or notification of both parents is not reasonably related to the state interest in giving the pregnant minor the benefit of parental advice. The State has not called our attention to, nor am I aware of, any other medical situation in Minnesota or elsewhere in which the provision of treatment for a child has been conditioned on notice to, or consent by, both parents rather than just one. Indeed, the fact that one-parent consent is the virtually uniform rule for any other activity which affects the minor's health, safety, or welfare emphasizes the aberrant quality of the two-parent notice requirement.

A judicial bypass that is designed to handle exceptions from a reasonable general rule, and thereby preserve the constitutionality of that rule, is quite different from a requirement that a minor—or a minor and one of her parents—must apply to a court for permission to avoid the application of a rule that is not reasonably related to legitimate state goals. A requirement that a minor acting with the consent of *both* parents apply to a court for permission to effectuate her decision clearly would constitute an unjustified official interference with the privacy of the minor and her family. The requirement that the bypass procedure must be invoked when the minor and one parent agree that the other parent should not be notified represents an equally unjustified governmental intrusion into the family's decisional process. When the parents are living together and have joint custody over the child, the State has no legitimate interest in the communication between father and mother about the child. "[W]here the parents are divorced, the minor and/or custodial parent, and not a court, is in the best position to determine whether notifying the non-custodial parent would be in the child's best interests." App. to Pet. for Cert. in No. 88–1125, p. 69a. As the Court of Appeals panel origi-

nally concluded, the "minor and custodial parent, . . . by virtue of their major interest and superior position, should alone have the opportunity to decide to whom, if anyone, notice of the minor's abortion decision should be given." *Ibid.* (citation omitted). I agree with that conclusion.

\* \* \*

The judgment of the Court of Appeals in its entirety is affirmed.

*It is so ordered.*

JUSTICE O'CONNOR, concurring in part and concurring in the judgment in part.

I

I join all but Parts III and VIII of JUSTICE STEVENS' opinion. While I agree with some of the central points made in Part III, I cannot join the broader discussion. I agree that the Court has characterized "[a] woman's decision to conceive or to bear a child [as] a component of her liberty that is protected by the Due Process Clause of the Fourteenth Amendment to the Constitution." *Ante,* at 434. See, *e. g., Carey* v. *Population Services International,* 431 U. S. 678, 685, 687 (1977); *Griswold* v. *Connecticut,* 381 U. S. 479, 502–503 (1965) (WHITE, J., concurring in judgment). This Court extended that liberty interest to minors in *Bellotti* v. *Baird,* 443 U. S. 622, 642 (1979) *(Bellotti II),* and *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52, 74 (1976), albeit with some important limitations: "[P]arental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions. As immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences, a State reasonably may determine that parental consultation often is desirable and in the best interest of the minor." *Bellotti II, supra,* at 640–641 (opinion of Powell, J.); see also *H. L.* v. *Matheson,* 450 U. S. 398, 423 (1981) (STEVENS, J., concurring in judgment); cf. *Thompson* v.

*Oklahoma*, 487 U. S. 815, 835 (1988) ("Inexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult"); *Stanford* v. *Kentucky*, 492 U. S. 361, 395 (1989) (BRENNAN, J., dissenting) ("[M]inors are treated differently from adults in our laws, which reflects the simple truth derived from communal experience, that juveniles as a class have not the level of maturation and responsibility that we presume in adults and consider desirable for full participation in the rights and duties of modern life").

It has been my understanding in this area that "[i]f the particular regulation does not 'unduly burde[n]' the fundamental right, . . . then our evaluation of that regulation is limited to our determination that the regulation rationally relates to a legitimate state purpose." *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 453 (1983) (O'CONNOR, J., dissenting); see also *Webster* v. *Reproductive Health Services*, 492 U. S. 490, 530 (1989) (O'CONNOR, J., concurring in part and concurring in judgment). It is with that understanding that I agree with JUSTICE STEVENS' statement that the "statute cannot be sustained if the obstacles it imposes are not reasonably related to legitimate state interests. Cf. *Turner* v. *Safley*, 482 U. S., at 97; *Carey v. Population Services International*, 431 U. S., at 704 (opinion of Powell, J.); *Doe v. Bolton*, 410 U. S. 179, 194–195, 199 (1973)." *Ante*, at 436.

I agree with JUSTICE STEVENS that Minnesota has offered no sufficient justification for its interference with the family's decisionmaking processes created by subdivision 2 of Minn. Stat. § 144.343 (1988)—two-parent notification. Subdivision 2 is the most stringent notification statute in the country. See *ante*, at 425, n. 5. The only other State that defines the generic term "parents," see, *e. g.*, Tenn. Code Ann. § 36-1–201, Art. III (6) (Supp. 1989) (adoption statute) ("'Parents'

means either the singular or plural of the word 'parent'"); see also *ante*, at 437, n. 23, as "both parents" is Arkansas, and that statute provides for numerous exceptions to the two-parent notification requirement and permits bypassing notification where notification would not be in the best interests of the minor. See Ark. Code Ann. §§ 20–16–802, 20–16–804, 20–16–808 (Supp. 1989).

The Minnesota exception to notification for minors who are victims of neglect or abuse is, in reality, a means of notifying the parents. As JUSTICE STEVENS points out, see *ante*, at 426, n. 7, to avail herself of the neglect or abuse exception, the minor must report the abuse. A report requires the welfare agency to immediately "conduct an assessment." Minn. Stat. § 626.556(10)(a) (1988). If the agency interviews the victim, it must notify the parent of the fact of the interview; if the parent is the subject of an investigation, he has a right of access to the record of the investigation. §§ 626.556 (10)(c); 626.556(11); see also Tr. of Oral Arg. 19 ("[I]t turns out that the reporting statute in Minnesota requires that after it's reported to the welfare department, the welfare department has to do an assessment and tell the parents about the assessment. This could all be done in a time frame even before the abortion occurs"). The combination of the abused minor's reluctance to report sexual or physical abuse, see *ante*, at 440, n. 26, with the likelihood that invoking the abuse exception *for the purpose of avoiding notice will result in notice*, makes the abuse exception less than effectual.

Minnesota's two-parent notice requirement is all the more unreasonable when one considers that only half of the minors in the State of Minnesota reside with both biological parents. See *ante*, at 437. A third live with only one parent. *Ibid.* Given its broad sweep and its failure to serve the purposes asserted by the State in too many cases, I join the Court's striking of subdivision 2.

## II

In a series of cases, this Court has explicitly approved judicial bypass as a means of tailoring a parental consent provision so as to avoid unduly burdening the minor's limited right to obtain an abortion. See *Bellotti* v. *Baird*, 428 U. S. 132, 147–148 (1976); *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52 (1976); *Bellotti II*, 443 U. S., at 642–644 (opinion of Powell, J.). In *Danforth*, the Court stated that the

> "primary constitutional deficiency lies in [the notification statute's] imposition of an absolute limitation on the minor's right to obtain an abortion. . . . [A] materially different constitutional issue would be presented under a provision requiring parental consent or consultation in most cases but providing for prompt (i) judicial resolution of any disagreement between the parent and the minor, or (ii) judicial determination that the minor is mature enough to give an informed consent without parental concurrence or that abortion in any event is in the minor's best interest. Such a provision would not impose parental approval as an absolute condition upon the minor's right but would assure in most instances consultation between the parent and child." 428 U. S., at 90–91.

Subdivision 6 passes constitutional muster because the interference with the internal operation of the family required by subdivision 2 simply does not exist where the minor can avoid notifying one or both parents by use of the bypass procedure.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE BLACKMUN join, concurring in part, concurring in the judgment in part, and dissenting in part.

I concur in Parts I, II, IV, and VII of JUSTICE STEVENS' opinion for the Court in No. 88–1309.[1] Although I do

[1] I concur in Part VII on the understanding that the opinion does not dispute that a minor's liberty interest alone outweighs the interest of the

not believe that the Constitution permits a State to require a minor to notify or consult with a parent before obtaining an abortion, compare *ante*, at 445, with *infra*, at 463–472, I am in substantial agreement with the remainder of the reasoning in Part V of JUSTICE STEVENS' opinion. For the reasons stated by the Court, *ante*, at 450–455, Minnesota's two-parent notification requirement is not even reasonably related to a legitimate state interest. Therefore, that requirement surely would not pass the strict scrutiny applicable to restrictions on a woman's fundamental right to have an abortion.

I dissent from the judgment of the Court in No. 88–1125, however, that the judicial bypass option renders the parental notification and 48-hour delay requirements constitutional. See *ante*, at 461 (opinion of O'CONNOR, J.); *post*, at 497–501 (opinion of KENNEDY, J.). The bypass procedure cannot save those requirements because the bypass itself is unconstitutional both on its face and as applied. At the very least, this scheme substantially burdens a woman's right to privacy without advancing a compelling state interest. More significantly, in some instances it usurps a young woman's control over her own body by giving either a parent or a court the power effectively to veto her decision to have an abortion.

## I

This Court has consistently held since *Roe* v. *Wade*, 410 U. S. 113 (1973), that the constitutional right of privacy "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.*, at 153. We have also repeatedly stated that "[a] woman's right to make that choice freely is fundamental." *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747, 772 (1986). Accord, *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 420, n. 1 (1983); *Roe, supra*, at

---

second parent in shaping a child's values and lifestyles, regardless of the interest of the first parent. Cf. *ante*, at 452–453.

155.   As we reiterated in *American College of Obstetricians and Gynecologists, supra*, "Few decisions are more personal and intimate, more properly private, or more basic to individual dignity and autonomy, than a woman's decision—with the guidance of her physician and within the limits specified in *Roe*—whether to end her pregnancy." *Id.*, at 772.   Accordingly, we have subjected state laws limiting that right to the most exacting scrutiny, requiring a State to show that such a law is narrowly drawn to serve a compelling interest.   *Roe, supra*, at 155; *Akron Center for Reproductive Health, supra*, at 427.   Only such strict judicial scrutiny is sufficiently protective of a woman's right to make the intensely personal decision whether to terminate her pregnancy.

*Roe* remains the law of the land.   See *Webster* v. *Reproductive Health Services*, 492 U. S. 490, 521 (1989) (plurality opinion); *id.*, at 525 (O'CONNOR, J., concurring in part and concurring in judgment); *id.*, at 537, 560 (BLACKMUN, J., concurring in part and dissenting in part).   Indeed, today's decision reaffirms the vitality of *Roe*, as five Justices have voted to strike down a state law restricting a woman's right to have an abortion.   Accordingly, to be constitutional, state restrictions on abortion must meet the rigorous test set forth above.

## II

I strongly disagree with the Court's conclusion that the State may constitutionally force a minor woman either to notify both parents (or in some cases only one parent[2]) and then wait 48 hours before proceeding with an abortion, or disclose her intimate affairs to a judge and ask that he grant her permission to have an abortion.   See *post*, at 497–501 (opinion of KENNEDY, J.).   Cf. *ante*, at 448–449 (opinion of STEVENS, J.) (finding that requiring minor to wait 48 hours after notifying *one* parent reasonably furthers legitimate state interest).

---

[2] The statute provides for one-parent notification where only one parent is living or where the second parent "cannot be located through reasonably diligent effort."   Minn. Stat. § 144.343(3) (1988).

First, the parental notification and delay requirements significantly restrict a young woman's right to reproductive choice. I base my conclusion not on my intuition about the needs and attitudes of young women, but on a sizable and impressive collection of empirical data documenting the effects of parental notification statutes and of delaying an abortion. Second, the burdensome restrictions are not narrowly tailored to serve any compelling state interest. Finally, for the reasons discussed in Part III, *infra*, the judicial bypass procedure does not save the notice and delay requirements.

## A

Neither the scope of a woman's privacy right nor the magnitude of a law's burden is diminished because a woman is a minor. *Bellotti* v. *Baird*, 443 U. S. 622, 642 (1979) *(Bellotti II)* (opinion of Powell, J.); *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52, 74 (1976). Rather, a woman's minority status affects only the nature of the State's interests. Although the Court considers the burdens that the two-parent notification requirement imposes on a minor woman's exercise of her right to privacy, *ante*, at 450–451, and n. 36, it fails to recognize that forced notification of only one parent also significantly burdens a young woman's right to have an abortion, see *ante*, at 459–460 (opinion of O'CONNOR, J.); *post*, at 491–497 (opinion of KENNEDY, J.). Cf. *ante*, at 448–449 (opinion of STEVENS, J.).

A substantial proportion of pregnant minors voluntarily consult with a parent regardless of the existence of a notification requirement. See, *e. g.*, Torres, Forrest, & Eisman, Telling Parents: Clinic Policies and Adolescents' Use of Family Planning and Abortion Services, 12 Family Planning Perspectives 284, 287, 288, 290 (1980) (51% of minors discussed abortion with parents in the absence of a parental consent or notification requirement). Minors 15 years old or younger are even more likely voluntarily to discuss the abortion decision with their parents. *Id.*, at 290 (69% of such minors vol-

untarily discuss abortion with parents). For these women, the notification requirement by itself does not impose a significant burden. But for those young women who would choose not to inform their parents, the burden is evident: The notification requirement destroys their right to avoid disclosure of a deeply personal matter. Cf. *Whalen* v. *Roe*, 429 U. S. 589, 599–600 (1977).

A notification requirement can also have severe physical and psychological effects on a young woman. First, forced notification of one parent, like forced notification of both parents, can be extremely traumatic for a young woman, depending on the nature of her relationship with her parents. Cf. *ante*, at 450–451, and n. 36. The disclosure of a daughter's intention to have an abortion often leads to a family crisis, characterized by severe parental anger and rejection. Osofsky & Osofsky, Teenage Pregnancy: Psychosocial Considerations, 21 Clinical Obstetrics and Gynecology 1161, 1164–1165 (1978). The impact of any notification requirement is especially devastating for minors who live in fear of physical, psychological, or sexual abuse. See, *e. g.*, Clary, Minor Women Obtaining Abortions: A Study of Parental Notification in a Metropolitan Area, 72 American J. of Pub. Health 283, 284 (1982) (finding that many minors chose not to inform parents voluntarily because of fear of negative consequences such as physical punishment or other retaliation). See also Tr. 911 (testimony of Dr. Elissa Benedek) (stating that usually minors accurately predict parental reaction to news about daughters' pregnancies). Cf. *ante*, at 438–440, and n. 25. Certainly, child abuse is not limited to families with two parents.

Second, the prospect of having to notify a parent causes many young women to delay their abortions, thereby increasing the health risks of the procedure. See Cates, Schulz, & Grimes, The Risks Associated with Teenage Abortion, 309 New England J. of Medicine 621, 623 (1983) (finding that for women 19 years old and younger, the number of deaths per 100,000 abortions was 0.2 for the first 8 weeks of pregnancy,

0.6 for weeks 9 through 12, 3.4 for weeks 13 through 16, and 7.8 for week 17 and after). See also *H. L. v. Matheson*, 450 U. S. 398, 439 (1981) (MARSHALL, J., dissenting). The risks posed by this delay are especially significant because adolescents already delay seeking medical care until relatively late in their pregnancies, when risks are higher. See 1 National Research Council, Risking the Future: Adolescent Sexuality, Pregnancy, and Childbearing 114 (C. Hayes ed. 1987).

In addition, a notification requirement compels many minors seeking an abortion to travel to a State without such a requirement to avoid notifying a parent. Cartoof & Klerman, Parental Consent for Abortion: Impact of the Massachusetts Law, 76 American J. of Pub. Health 397, 399 (1986) (finding that one-third of minors seeking abortions traveled outside of State to avoid Massachusetts' parental notice requirement). Other women may resort to the horrors of self-abortion or illegal abortion rather than tell a parent. Torres, Forrest, & Eisman, *supra*, at 288 (9% of minors attending family planning clinics said they would have a self-induced or illegal abortion rather then tell a parent); *H. L. v. Matheson*, *supra*, at 439, and n. 26 (MARSHALL, J., dissenting). See also Greydanus & Railsback, Abortion in Adolescence, 1 Seminars in Adolescent Medicine 213, 214 (1985) (noting 100-times greater death rate for women who obtain illegal abortions than for those who obtain legal ones).[3] Still others would forgo an abortion entirely and carry the fetus to term, Torres, Forrest, & Eisman, *supra*, at 289, 291 (9% of minors in family planning clinics said they would carry fetus

---

[3] Dr. Jane Hodgson testified before the District Court that one 14-year-old patient, in order to keep her pregnancy private, tried to induce an abortion with the help of her friends by inserting a metallic object into her vagina, thereby tearing her body, scarring her cervix, and causing bleeding. When that attempt failed to induce an abortion, the patient, then four or five months pregnant, finally went to an abortion clinic. Because of the damage to the patient's cervix, doctors had to perform a hysterotomy, meaning that that woman must have a Cesarean section to deliver a child in the future. App. 462.

to term rather than inform parents of decision to abort), subjecting themselves to the much greater health risks of pregnancy and childbirth and to the physical, psychological, and financial hardships of unwanted motherhood. See Greydanus & Railsback, *supra*, at 214 (noting that minor's overall risk of dying from childbirth is over nine times greater than risk of dying from legal abortion); Lewis, Minors' Competence to Consent to Abortion, 42 American Psychologist 84, 87 (1987) ("[P]regnancy continuation poses far greater psychological, physical, and economic risks to the adolescent than does abortion") (citation omitted). See also *Bellotti II*, 443 U. S., at 642 (opinion of Powell, J.) ("[C]onsidering her probable education, employment skills, financial resources, and emotional maturity, unwanted motherhood may be exceptionally burdensome for a minor"). Clearly, then, requiring notification of one parent significantly burdens a young woman's right to terminate her pregnancy.

## B

The 48-hour delay *after* notification further aggravates the harm caused by the *pre*-notification delay that may flow from a minor's fear of notifying a parent. Moreover, the 48-hour delay burdens the rights of all minors, including those who would voluntarily consult with one or both parents.[4] JUSTICE STEVENS' assertion that the 48-hour delay "imposes only a minimal burden," *ante*, at 449; see also *post*, at 496 (opinion of KENNEDY, J.), ignores the increased health risks and costs that this delay entails. The District Court specifically found as a matter of fact that "[d]elay of any length in performing an abortion increases the statistical risk of mortality and morbidity." 648 F. Supp. 756, 765 (Minn. 1986). Even a brief delay can have a particularly detrimental impact if it pushes the abortion into the second trimester, when the operation is substantially more risky and costly. *Ibid.* See

---

[4] As JUSTICE STEVENS notes, *ante*, at 449, and n. 35, the 48-hour delay does not apply if a parent or court consents to the abortion.

also C. Tietze & S. Henshaw, Induced Abortion: A World Review 1986, pp. 103–104 (6th ed. 1986) (rate of major complications nearly doubles in the week following the end of the first trimester and increases significantly thereafter). Moreover, the District Court found that the 48-hour delay "frequently is compounded by scheduling factors such as clinic hours, transportation requirements, weather, a minor's school and work commitments, and sometimes a single parent's family and work commitments," often resulting in an effective delay of a week or more. 648 F. Supp., at 765.[5] The increased risk caused by a delay of that magnitude, the District Court found, is statistically significant at any point in the pregnancy. *Ibid.* Certainly no pregnant woman facing these heightened risks to her health would dismiss them as "minimal."[6]

---

[5] Although these other factors would constrain a young woman's ability to schedule an abortion even in the absence of the 48-hour delay requirement, the addition of the immutable statutory delay reduces both the woman's and the clinic's scheduling flexibility and thus can exacerbate the effect of the other factors. For instance, a woman might contact a clinic on Monday and find that her schedule and the clinic's allow for only a Tuesday appointment for that week. Without the 48-hour delay requirement, the woman could be treated the next day; with the statutory delay, however, the woman would be forced to wait a week.

[6] JUSTICE STEVENS concludes that the 48-hour delay requirement actually results in "little or no delay" because the statutory period "may run concurrently with the time necessary to make an appointment for the procedure." *Ante,* at 449. See also *post,* at 496 (opinion of KENNEDY, J.) ("48-hour waiting period . . . results in little or no delay"); 853 F. 2d 1452, 1465 (CA8 1988) (en banc). JUSTICE STEVENS bases this conclusion on the testimony of the coadministrator of one abortion clinic that a 1- or 2-day scheduling backlog was typical. *Ante,* at 449, n. 34. "One or two days," however, obviously means that the backlog is not necessarily 48 hours. Furthermore, that witness also stated that if "a woman says that she must be seen on a particular day our policy is we will always see her." App. 147. But because of the mandated 48-hour delay, the clinic cannot honor a woman's request for an abortion until at least two full days have elapsed. The testimony therefore is hardly sufficient to justify ignoring the District Court's factual finding with regard to the effects of the delay requirement.

## C

Because the parental notification and delay requirements burden a young woman's right freely to decide whether to terminate her pregnancy, the State must show that these requirements are justified by a compelling state interest and are closely tailored to further that interest. The main purpose of the notification requirement is to "protect the well-being of minors by encouraging minors to discuss with their parents the decision whether to terminate their pregnancies" *Id.*, at 766. The 48-hour delay, in turn, is designed to provide parents with adequate time to consult with their daughters. *Ante*, at 448–449 (opinion of STEVENS, J.); *post*, at 496 (opinion of KENNEDY, J.). As JUSTICE STEVENS states, such consultation is intended to ensure that the minor's decision is "knowing and intelligent." *Ante*, at 448. I need not determine whether the State's interest ultimately outweighs young women's privacy interests, however, because the strictures here are not closely tailored to further the State's asserted goal.

For the many young women who would voluntarily consult with a parent before having an abortion, see *supra*, at 464–465, the notification and delay requirements are superfluous, and so do not advance the State's interest. The requirements affect only those women who would not otherwise notify a parent. But compelled notification is unlikely to result in productive consultation in families in which a daughter does not feel comfortable consulting her parents about intimate or sexual matters. See Melton, Legal Regulation of Adolescent Abortion: Unintended Effects, 42 American Psychologist 79, 81 (1987) (stating that in many families, compelled parental notification is unlikely to result in meaningful discussion about the daughter's predicament); Tr. 1357–1358 (testimony of Dr. Steven Butzer) (stating that involuntary disclosure is disruptive to family and has "almost universally negative" effects, in accord with minor's expectations).

Moreover, in those families with a history of child abuse, a pregnant minor forced to notify a parent is more likely to be greeted by physical assault or psychological harassment than open and caring conversation about her predicament. See Tr. 316 (testimony of Dr. Lenore Walker) (stating that forced notification in dysfunctional families is likely to sever communication patterns and increase the risk of violence); *H. L. v. Matheson*, 450 U. S., at 446 (MARSHALL, J., dissenting). Forced notification in such situations would amount to punishing the daughter for the lack of a stable and communicative family environment, when the blame for that situation lies principally, if not entirely, with the parents. Parental notification in the less-than-ideal family, therefore, would not lead to an informed decision by the minor.[7]

The State also claims that the statute serves the interest of protecting parents' independent right "to shape the[ir] child[ren]'s values and life style[s]" and "to determine and strive for what they believe to be best for their children." Brief for Petitioners in No. 88–1309, p. 26. If this is so, the statute is surely underinclusive, as it does not require parental notification where the minor seeks medical treatment for pregnancy, venereal disease, or alcohol and other drug abuse. See Minn. Stat. § 144.343(1) (1988). Are we to believe that

---

[7] The State also asserts that the requirements permit parents to provide doctors with relevant information about their daughters' medical history and "to assist with ensuring that proper after-care procedures are followed." Brief for Petitioners in No. 88–1309, pp. 34–36. See also *ante*, at 448 (opinion of STEVENS, J.) (delay period "permits the parent to inquire into the competency of the doctor performing the abortion"). If these are actual state interests, it seems peculiar that the State does not try to facilitate similar parental involvement in minors' treatment for pregnancy and childbirth, see *infra* this page, which pose far greater risks to the minor's health than abortion, see *supra*, at 466–467. In any event, compelled notification is unlikely to result in helpful parental involvement in those families in which a parent reacts to the news of the daughter's predicament by rejecting or abusing the young woman. See *supra* this page.

Minnesota parents have no interest in their children's well-being in these other contexts?

In any event, parents' right to direct their children's upbringing is a right *against* state interference with family matters. See, *e. g.*, *Prince* v. *Massachusetts*, 321 U. S. 158, 166 (1944) (noting that this Court's decisions "have respected the private realm of family life which the state cannot enter"). See also *Wisconsin* v. *Yoder*, 406 U. S. 205, 232 (1972); *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535 (1925). Yet, ironically, the State's requirements here affirmatively interfere in family life by trying to force families to conform to the State's archetype of the ideal family. Cf. *Moore* v. *East Cleveland*, 431 U. S. 494, 506 (1977) (plurality opinion) ("[T]he Constitution prevents [the State] from standardizing its children—and its adults—by forcing all to live in certain narrowly defined family patterns"); *ante*, at 452. It is a strange constitutional alchemy that would transform a limitation on state power into a justification for governmental intrusion into family interactions. Moreover, as a practical matter, "state intervention is hardly likely to resurrect parental authority that the parents themselves are unable to preserve." *H. L.* v. *Matheson, supra*, at 448 (MARSHALL, J., dissenting). See also *Planned Parenthood of Central Mo.*, 428 U. S., at 75 (finding it unlikely that parental veto power over abortion "will enhance parental authority or control where the minor and the nonconsenting parent are so fundamentally in conflict and the very existence of the pregnancy already has fractured the family structure").

Even if the State's interest is construed as merely the *facilitation* of the exercise of parental authority, the notification and delay requirements are not narrowly drawn. Parental authority is not limitless. Certainly where parental involvement threatens to harm the child, the parent's authority must yield. *Prince* v. *Massachusetts, supra*, at 169–170; *H. L.* v. *Matheson, supra*, at 449 (MARSHALL, J., dissenting). Yet the notification and delay requirements facili-

tate the exercise of parental authority even where it may physically or psychologically harm the child. See *supra*, at 470.

Furthermore, the exercise of parental authority in some instances will take the form of obstructing the minor's decision to have an abortion. A parent who objects to the abortion, once notified, can exert strong pressure on the minor—in the form of stern disapproval, withdrawal of financial support, or physical or emotional abuse—to block her from getting an abortion. See *Bellotti II*, 443 U. S., at 647 (opinion of Powell, J.) ("[M]any parents hold strong views on the subject of abortion, and young pregnant minors, especially those living at home, are particularly vulnerable to their parents' efforts to obstruct . . . an abortion"). See also *H. L.* v. *Matheson*, 450 U. S., at 438–439 (MARSHALL, J., dissenting). In such circumstances, the notification requirement becomes, in effect, a consent requirement. As discussed below, *infra*, at 473, the State may not permit any person, including a parent, to veto a woman's decision to terminate her pregnancy. Because the notification and delay requirements effectively give parents the opportunity to exercise an unconstitutional veto in some situations, those requirements are not narrowly tailored to the State's interest in facilitating *legitimate* exercises of parental authority.

## III

The parental notification and 48-hour delay requirements, then, do not satisfy the strict scrutiny applicable to laws restricting a woman's constitutional right to have an abortion. The judicial bypass procedure cannot salvage those requirements because that procedure itself is unconstitutional.

## A

The State argues that the bypass procedure saves the notification and delay requirements because it provides an alternative way to obtain a legal abortion for minors who would be harmed by those requirements. This Court has upheld a

one-parent consent requirement where the State provided an alternative judicial procedure "'whereby a pregnant minor [could] demonstrate that she [was] sufficiently mature to make the abortion decision herself or that, despite her immaturity, an abortion would be in her best interests.'" *Planned Parenthood Assn. of Kansas City, Mo., Inc.* v. *Ashcroft,* 462 U. S. 476, 491 (1983) (opinion of Powell, J.) (quoting *Akron Center for Reproductive Health,* 462 U. S., at 439–440).

I continue to believe, however, that a judicial bypass procedure of this sort is itself unconstitutional because it effectively gives a judge "an absolute veto over the decision of the physician and his patient." *Planned Parenthood Assn. of Kansas City, supra,* at 504 (BLACKMUN, J., concurring in part and dissenting in part); see also *Bellotti II,* 443 U. S., at 655 (STEVENS, J., concurring in judgment) ("The provision of an absolute veto to a judge . . . is to me particularly troubling. . . . It is inherent in the right to make the abortion decision that the right may be exercised without public scrutiny and in defiance of the contrary opinion of the sovereign or other third parties") (footnote omitted); *Planned Parenthood of Central Mo., supra,* at 74 ("[T]he State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent"). No person may veto *any* minor's decision, made in consultation with her physician, to terminate her pregnancy. An "immature" minor has no less right to make decisions regarding her own body than a mature adult.

Minnesota's bypass provision allows a judge to authorize an abortion if he determines either that a woman is sufficiently mature to make the decision on her own or, if she is not sufficiently mature, that an abortion without parental notification would serve her best interests. Minn. Stat. § 144.343(6) (1988). Of course, if a judge refuses to authorize

an abortion, a young woman can then reevaluate whether she wants to notify a parent. But many women will carry the fetus to term rather than notify a parent. See *supra,* at 466–467. Other women may decide to inform a parent but then confront parental pressure or abuse so severe as to obstruct the abortion. For these women, the judge's refusal to authorize an abortion effectively constitutes an absolute veto.

The constitutional defects in any provision allowing someone to veto a woman's abortion decision are exacerbated by the vagueness of the standards contained in this statute. The statute gives no guidance on how a judge is to determine whether a minor is sufficiently "mature" and "capable" to make the decision on her own. See Minn. Stat. § 144.343(6)(c)(i) (1988) (judge shall authorize abortion if he "determines that the pregnant woman is mature and capable of giving informed consent to the proposed abortion"). Cf. Lewis, 42 American Psychologist, at 84, 87 (noting the absence of a judicial standard for assessing maturity). The statute similarly is silent as to how a judge is to determine whether an abortion without parental notification would serve an immature minor's "best interests." § 144.343(6)(c)(i) (judge shall authorize abortion for immature minor without notification "if said judge concludes that the pregnant woman's best interests would be served thereby"). Is the judge expected to know more about the woman's medical needs or psychological makeup than her doctor? Should he consider the woman's financial and emotional · status to determine the quality of life the woman and her future child would enjoy in this world? Neither the record nor the Court answers such questions. As JUSTICE STEVENS wrote in *Bellotti II,* the best interest standard "provides little real guidance to the judge, and his decision must necessarily reflect personal and societal values and mores whose enforcement upon the minor—particularly when contrary to her own informed and reasonable decision—is fundamentally at odds with privacy interests underlying the constitutional protec-

tion afforded to her decision." 443 U. S., at 655–656 (opinion concurring in judgment). It is difficult to conceive of any reason, aside from a judge's personal opposition to abortion, that would justify a finding that an immature woman's best interests would be served by forcing her to endure pregnancy and childbirth against her will.

## B

Even if I did not believe that a judicial bypass procedure was facially unconstitutional, the experience of Minnesota's procedure in operation demonstrates that the bypass provision before us cannot save the parental notification and delay requirements. This Court has addressed judicial bypass procedures only in the context of facial challenges. See *Planned Parenthood Assn. of Kansas City*, 462 U. S., at 490–493 (opinion of Powell, J.); *Akron Center for Reproductive Health*, 462 U. S., at 439–442; *Bellotti II*, 443 U. S., at 643–644 (opinion of Powell, J.). The Court has never considered the actual burdens a particular bypass provision imposes on a woman's right to choose an abortion. Such consideration establishes that, even if judges authorized every abortion sought by petitioning minors, Minnesota's judicial bypass is far too burdensome to remedy an otherwise unconstitutional statute.

The District Court found that the bypass procedure imposed significant burdens on minors. First, "scheduling practices in Minnesota courts typically require minors to wait two or three days between their first contact with the court and the hearing on their petitions. This delay may combine with other factors to result in a delay of a week or more." 648 F. Supp., at 763. As noted above, *supra*, at 467–468, a delay of only a few days can significantly increase the health risks to the minor; a week-long delay inevitably does. Furthermore, in several counties in Minnesota, no judge is willing to hear bypass petitions, forcing women in those areas to travel long distances to obtain a hearing. 648 F. Supp., at

763; Donovan, Judging Teenagers: How Minors Fare When They Seek Court-Authorized Abortions, 15 Family Planning Perspectives 259, 264 (1983) (50% of Minnesota minors utilizing bypass were not residents of city in which court was located); Melton, 42 American Psychologist, at 80 ("In Minnesota, where judges in rural counties have often recused themselves from participation in the abortion hearings, minors sometimes have to travel a round-trip of more than 500 miles for the hearing"). The burden of such travel, often requiring an overnight stay in a distant city, is particularly heavy for poor women from rural areas. Furthermore, a young woman's absence from home, school, or work during the time required for such travel and for the hearing itself can jeopardize the woman's confidentiality. See *ibid.*

The District Court also found that the bypass procedure can be extremely traumatic for young women.

> "The experience of going to court for a judicial authorization produces fear and tension in many minors. Minors are apprehensive about the prospect of facing an authority figure who holds in his hands the power to veto their decision to proceed without notifying one or both parents. Many minors are angry and resentful at being required to justify their decision before complete strangers. Despite the confidentiality of the proceeding, many minors resent having to reveal intimate details of their personal and family lives to these strangers. Finally, many minors are left feeling guilty and ashamed about their lifestyle and their decision to terminate their pregnancy. Some mature minors and some minors in whose best interests it is to proceed without notifying their parents are so daunted by the judicial proceeding that they forego the bypass option and either notify their parents or carry to term.
>
> "Some minors are so upset by the bypass proceeding that they consider it more difficult than the medical procedure itself. Indeed the anxiety resulting from the by-

pass proceeding may linger until the time of the medical procedure and thus render the latter more difficult than necessary." 648 F. Supp., at 763–764.[8]

Yet, despite the substantial burdens imposed by these proceedings, the bypass is, in effect, a "rubber stamp," *id.*, at 766 (testimony of Hon. William Sweeney); only an extremely small number of petitions are denied, *id.*, at 765. See also Melton, *supra*, at 80 ("Available research indicates that judicial bypass proceedings are merely pro forma. Although they represent substantial intrusion on minors' privacy and take up significant amounts of court time, there is no evidence that they promote more reasoned decisionmaking or screen out adolescents who may be particularly immature or vulnerable. . . . The hearings typically last less than 15 minutes. . . . Despite the complex issues involved (maturity and the best interests of the minor), experts are rarely if ever called to testify"). The judges who have adjudicated over 90% of the bypass petitions between 1981 and 1986 could not identify any positive effects of the bypass procedure. See 648 F. Supp., at 766; *ante*, at 441–442, and n. 29. The large number of women who undergo the bypass process do not receive any sort of counseling from the court—which is not surprising, given the court's limited role and lack of expertise in that area. The bypass process itself thus cannot serve the state interest of promoting informed decisionmaking by all minors. If the State truly were concerned about ensuring

---

[8] Dr. Hodgson testified that some minors dread the court procedure so much that they become "wringing wet with perspiration" and frequently require a sedative beforehand. App. 468. One judge who has heard a significant number of bypass petitions testified that the court experience is "'very nervewracking'" for young women. 648 F. Supp., at 766. Another testified that pregnant minors' "'level of apprehension is twice what I normally see in court. . . . You see all the typical things that you would see with somebody under incredible amounts of stress, answering monosyllabically, tone of voice, tenor of voice, shaky, wringing of hands, you know, one young lady had her—her hands were turning blue and it was warm in my office.'" *Ibid.*

that all minors consult with a knowledgeable and caring adult, it would provide for some form of counseling rather than for a judicial procedure in which a judge merely gives or withholds his consent.[9]

Thus, regardless of one's view of the facial validity of a bypass procedure, Minnesota's procedure in practice imposes an excessive burden on young women's right to choose an abortion. Cf. *Bellotti II*, 443 U. S., at 655 (STEVENS, J., concurring in judgment) ("[T]he need to commence judicial proceedings in order to obtain a legal abortion would impose a burden at least as great as, and probably greater than, that imposed on the minor child by the need to obtain the consent of a parent"). Furthermore, the process does not serve the State's interest of ensuring that minors' decisions are informed. Surely, then, a State could not require that *all* minor women seeking an abortion obtain judicial approval.[10] The Court's holding that the burdensome bypass procedure saves the State's burdensome notification and delay require-

---

[9] Maine, for example, requires that a minor obtain the consent of a parent, guardian, or adult family member; undergo a judicial bypass; *or* receive counseling from the physician or a counselor according to specified criteria. See Me. Rev. Stat. Ann., Tit. 22, § 1597–A (Supp. 1989). Wisconsin requires abortion providers to encourage parental notification unless they determine that the minor has a valid reason for not notifying her parents. Wis. Stat. § 146.78 (1987–1988). In the latter situation, the provider must encourage—but not require—the minor to notify "another family member, close family friend, school counselor, social worker or other appropriate person." § 146.78(5)(c). I express no opinion on the constitutionality or efficacy of these schemes, but raise them only as examples of alternatives that seem more closely related than a judicial bypass procedure to the goal of ensuring that the minor's decision is informed.

In any event, most abortion clinics already provide extensive counseling. See 1 National Research Council, Risking the Future: Adolescent Sexuality, Pregnancy, and Childbearing 191–192 (C. Hayes ed. 1987) (90% of abortion clinics routinely provide counseling for all first-abortion patients, and all clinics make counseling available to all patients on request).

[10] Indeed, the State conceded in oral argument before the Eighth Circuit, sitting en banc, that a judicial approval provision by itself would be unconstitutional. See 853 F. 2d, at 1469 (Lay, C. J., dissenting).

ments thus strikes me as the equivalent of saying that two wrongs make a right. I cannot accept such a novel judicial calculus.

## IV

A majority of the Court today strikes down an unreasonable and vastly overbroad requirement that a pregnant minor notify both her parents of her decision to obtain an abortion. With that decision I agree. At the same time, though, a different majority holds that a State may require a young woman to notify one or even both parents and then wait 48 hours before having an abortion, as long as the State provides a judicial bypass procedure. From that decision I vehemently dissent. This scheme forces a young woman in an already dire situation to choose between two fundamentally unacceptable alternatives: notifying a possibly dictatorial or even abusive parent and justifying her profoundly personal decision in an intimidating judicial proceeding to a black-robed stranger. For such a woman, this dilemma is more likely to result in trauma and pain than in an informed and voluntary decision.

JUSTICE SCALIA, concurring in the judgment in part and dissenting in part.

As I understand the various opinions today: One Justice holds that two-parent notification is unconstitutional (at least in the present circumstances) without judicial bypass, but constitutional with bypass, *ante*, at 459–461 (O'CONNOR, J., concurring in part and concurring in judgment in part); four Justices would hold that two-parent notification is constitutional with or without bypass, *post*, at 488–497 (KENNEDY, J., concurring in judgment in part and dissenting in part); four Justices would hold that two-parent notification is unconstitutional with or without bypass, though the four apply two different standards, *ante*, at 455–458 (opinion of STEVENS, J.), *ante*, at 472–479 (MARSHALL, J., concurring in part, concurring in judgment in part and dissenting in part);

six Justices hold that one-parent notification with bypass is constitutional, though for two different sets of reasons, *Ohio v. Akron Center for Reproductive Health, post,* at 510–517; *post,* at 522–524 (STEVENS, J., concurring in part and concurring in judgment); and three Justices would hold that one-parent notification with bypass is unconstitutional, *post,* at 526–527 (BLACKMUN, J., dissenting). One will search in vain the document we are supposed to be construing for text that provides the basis for the argument over these distinctions; and will find in our society's tradition regarding abortion no hint that the distinctions are constitutionally relevant, much less any indication how a constitutional argument about them ought to be resolved. The random and unpredictable results of our consequently unchanneled individual views make it increasingly evident, Term after Term, that the tools for this job are not to be found in the lawyer's—and hence not in the judge's—workbox. I continue to dissent from this enterprise of devising an Abortion Code, and from the illusion that we have authority to do so.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE SCALIA join, concurring in the judgment in part and dissenting in part.

"'There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child. That is a grave decision, and a girl of tender years, under emotional stress, may be ill-equipped to make it without mature advice and emotional support.'" *Bellotti* v. *Baird (Bellotti II),* 443 U. S. 622, 640–641 (1979) (opinion of Powell, J.) (quoting *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52, 91 (1976) (Stewart, J., concurring)); see also *H. L.* v. *Matheson,* 450 U. S. 398, 409–411 (1981); *id.,* at 422–423 (STEVENS, J., concurring in judgment); *Danforth, supra,* at 94–95 (WHITE, J., concurring in part and dissenting in part); *id.,* at 102–103 (STEVENS, J., concurring in

part and dissenting in part). Today, the Court holds that a statute requiring a minor to notify both parents that she plans to have an abortion is not a permissible means of furthering the interest described with such specificity in *Bellotti II*. This conclusion, which no doubt will come as a surprise to most parents, is incompatible with our constitutional tradition and any acceptable notion of judicial review of legislative enactments. I dissent from the portion of the Court's judgment affirming the Court of Appeals' conclusion that the Minnesota two-parent notice statute is unconstitutional.

The Minnesota statute also provides, however, that if the two-parent notice requirement is invalidated, the same notice requirement is effective unless the pregnant minor obtains a court order permitting the abortion to proceed. Minn. Stat. § 144.343(6) (1988). The Court of Appeals sustained this portion of the statute, in effect a two-parent notice requirement with a judicial bypass. Five Members of the Court, the four who join this opinion and JUSTICE O'CONNOR, agree with the Court of Appeals' decision on this aspect of the statute. As announced by JUSTICE STEVENS, who dissents from this part of the Court's decision, the Court of Appeals' judgment on this portion of the statute is therefore affirmed.

## I

The provisions of the statute before us are straightforward. In essence, the statute provides that before a physician in Minnesota may perform an abortion on an unemancipated minor, the physician or the physician's agent must notify both of the minor's parents, if each one can be located through reasonable effort, either personally or by certified mail at least 48 hours before the abortion is performed. Minn. Stat. §§ 144.343(2)–(3) (1988). Notification is not required if the abortion is necessary to prevent the minor's death; or if both parents have consented to the abortion; or if the minor declares that she is the victim of sexual abuse, neglect, or physical abuse. § 144.343(4). Failure to comply

with these requirements is a misdemeanor, and the statute authorizes a civil action against the noncomplying physician by the minor's parents. § 144.343(5).

The statute also provides that, if a court enjoins the notice requirement of subdivision 2, parental notice under the subdivision shall still be required, unless the minor obtains a court order dispensing with it. Under the statute, the court is required to authorize the physician to perform the abortion without parental notice if the court determines that the minor is "mature and capable of giving informed consent to the proposed abortion" or that "the performance of an abortion upon her without notification of her parents, guardian, or conservator would be in her best interests." § 144.343(6).

## II

The State identifies two interests served by the law. The first is the State's interest in the welfare of pregnant minors. The second is the State's interest in acknowledging and promoting the role of parents in the care and upbringing of their children. JUSTICE STEVENS, writing for two Members of the Court, acknowledges the legitimacy of the first interest, but decides that the second interest is somehow illegitimate, at least as to whichever parent a minor chooses not to notify. I cannot agree that the Constitution prevents a State from keeping both parents informed of the medical condition or medical treatment of their child under the terms and conditions of this statute.

The welfare of the child has always been the central concern of laws with regard to minors. The law does not give to children many rights given to adults, and provides, in general, that children can exercise the rights they do have only through and with parental consent. *Parham* v. *J. R.*, 442 U. S. 584, 621 (1979) (Stewart, J., concurring in judgment). Legislatures historically have acted on the basis of the qualitative differences in maturity between children and adults, see *Schall* v. *Martin*, 467 U. S. 253, 265–267 (1984); *Thomp-*

*son* v. *Oklahoma*, 487 U. S. 815, 853–854 (1988) (O'CONNOR, J., concurring in judgment) (collecting cases); *Stanford* v. *Kentucky*, 492 U. S. 361, 384 (1989) (BRENNAN, J., dissenting), and not without reason. Age is a rough but fair approximation of maturity and judgment, and a State has an interest in seeing that a child, when confronted with serious decisions such as whether or not to abort a pregnancy, has the assistance of her parents in making the choice. If anything is settled by our previous cases dealing with parental notification and consent laws, it is this point. See *Bellotti II*, 443 U. S., at 640–641 (opinion of Powell, J.); *Matheson*, 450 U. S., at 409–411; *id.*, at 422–423 (STEVENS, J., concurring in judgment).

Protection of the right of each parent to participate in the upbringing of her or his own children is a further discrete interest that the State recognizes by the statute. The common law historically has given recognition to the right of parents, not merely to be notified of their children's actions, but to speak and act on their behalf. Absent a showing of neglect or abuse, a father "possessed the paramount right to the custody and control of his minor children, and to superintend their education and nurture." J. Schouler, Law of Domestic Relations 337 (3d. ed. 1882); see also 1 W. Blackstone, Commentaries *452–*453; 2 J. Kent, Commentaries on American Law *203–*206; G. Field, Legal Relations of Infants 63–80 (1888). In this century, the common law of most States has abandoned the idea that parental rights are vested solely in fathers, with mothers being viewed merely as agents of their husbands, cf. *ante*, at 446, n. 32; it is now the case that each parent has parental rights and parental responsibilities, see W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts, ch. 4, § 18, p. 115 (5th ed. 1984). Limitations have emerged on the prerogatives of parents to act contrary to the best interests of the child with respect to matters such as compulsory schooling and child labor. As a general matter, however, it re-

mains "cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince* v. *Massachusetts*, 321 U. S. 158, 166 (1944). "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin* v. *Yoder*, 406 U. S. 205, 232 (1972); see also *Pierce* v. *Society of Sisters*, 268 U. S. 510, 535 (1925).

A State pursues a legitimate end under the Constitution when it attempts to foster and preserve the parent-child relationship by giving all parents the opportunity to participate in the care and nurture of their children. We have held that parents have a liberty interest, protected by the Constitution, in having a reasonable opportunity to develop close relations with their children. See *Santosky* v. *Kramer*, 455 U. S. 745, 753–754 (1982); *Caban* v. *Mohammed*, 441 U. S. 380 (1979); *Stanley* v. *Illinois*, 405 U. S. 645, 651–652 (1972). We have recognized, of course, that there are limits to the constitutional right of parents to have custody of, or to participate in decisions affecting, their children. If a parent has relinquished the opportunity to develop a relationship with the child, and his or her only link to the child is biological, the Constitution does not require a State to allow parental participation. See *Lehr* v. *Robertson*, 463 U. S. 248, 261–265 (1983); *Quilloin* v. *Walcott*, 434 U. S. 246, 254–256 (1978). But the fact that the Constitution does not protect the parent-child relationship in all circumstances does not mean that the State cannot attempt to foster parental participation where the Constitution does not demand that it do so. A State may seek to protect and facilitate the parent-child bond on the assumption that parents will act in their child's best interests. See *Parham* v. *J. R.*, *supra*, at 602–603; *Ginsberg* v. *New York*, 390 U. S. 629, 639 (1968). Indeed,

we have held that a State cannot terminate parental rights based upon a presumption that a class of parents is unfit without affording individual parents an opportunity to rebut the presumption. See *Stanley, supra,* at 654–658; *Santosky, supra,* at 753 ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents . . ."). If a State cannot legislate on the broad assumption that classes of parents are unfit and undeserving of parental rights without affording an opportunity to rebut the assumption, it is at least permissible for a State to legislate on the premise that parents, as a general rule, are interested in their children's welfare and will act in accord with it.

The Court's descriptions of the State's interests in this case are caricatures, both of the law and of our most revered institutions. The Court labels these interests as ones in "standardizing its children and adults," and in ensuring that each family, to the extent possible, "conform to some state-designed ideal." *Ante,* at 452; see also *ante,* at 471 (MARSHALL, J., concurring in part, concurring in judgment in part, and dissenting in part) (accusing Minnesota of "trying to force families to conform to the State's archetype of the ideal family"). Minnesota asserts no such purpose, by explicit statement or by any permissible inference. All that Minnesota asserts is an interest in seeing that parents know about a vital decision facing their child. That interest is a valid one without regard to whether the child is living with either one or both parents, or to the attachment between the minor's parents. How the family unit responds to such notice is, for the most part, beyond the State's control. The State would no doubt prefer that all parents, after being notified under the statute, would contact their daughters and assist them in making their decisions with the child's best interests at heart; but it has not, contrary to the Court's intimation, "decreed" communication, nor could it. What

the State can do is make the communication possible by at least informing parents of their daughter's intentions.

Minnesota has done no more than act upon the common-sense proposition that, in assisting their daughter in deciding whether to have an abortion, parents can best fulfill their roles if they have the same information about their own child's medical condition and medical choices as the child's doctor does; and that to deny parents this knowledge is to risk, or perpetuate, estrangement or alienation from the child when she is in the greatest need of parental guidance and support. The Court does the State, and our constitutional tradition, sad disservice by impugning the legitimacy of these elemental objectives.

Given the societal interest that underlies parental notice and consent laws, it comes as no surprise that most States have enacted statutes requiring that, in general, a physician must notify or obtain the consent of at least one of her parents or legal guardian before performing an abortion on a minor. See Wardle, "Time Enough": *Webster* v. *Reproductive Health Services* and the Prudent Pace of Justice, 41 Fla. L. Rev. 881, 963–965 (1989) (collecting statutes). Five States, including Minnesota, appear to require, as a general rule, the notification of both parents before a physician may perform an abortion on a minor. See Ark. Code Ann. §§ 20–16–801 through 20–16–808 (Supp. 1989); Idaho Code § 18–610 (6) (1987); Tenn. Code Ann. § 39–15–202(f) (Supp. 1989); Utah Code Ann. § 76–7–304 (1990). Another six States appear to require, with varying exceptions, the consent of both parents. See Del. Code Ann., Tit. 24, § 1790(b)(3) (1987); Ill. Rev. Stat., ch. 38, ¶ 81–54(3) (1989); Ky. Rev. Stat. Ann. § 311.732 (Michie 1990); Mass. Gen. Laws § 112:12S (1988); Miss. Code. Ann. § 41–41–53 (Supp. 1989); N. D. Cent. Code § 14–02.1–03.1 (1981). Whether these statutes are more or less restrictive than the Minnesota statute is not the issue, although I pause to note that because the Court's decision today turns upon its perception that the law's requirements,

despite its exceptions, are the most "stringent" in the country, see *ante*, at 459 (O'CONNOR, J., concurring in part and concurring in judgment), the Court's decision has no import for the validity of these other statutes. What is important is that Minnesota is not alone in acknowledging the vitality of these governmental interests and adopting laws that, in the legislature's judgment, are best suited to serving them while protecting the minor's welfare.

On a more general level, the current trend among state legislatures is to enact joint custody laws making it the norm for divorced or separated parents to share the legal responsibility and authority for making decisions concerning their children's care, education, religion, and medical treatment. See 2 H. Clark, Law of Domestic Relations in the United States § 20.5 (2d ed. 1987); Folberg, Joint Custody Law—The Second Wave, 23 J. Family L. 1, 14–55 (1984–1985) (collecting statutes). Under Minnesota law, for example, there exists a presumption in divorce proceedings that joint custody, if requested by either or both parents, is in the best interests of the child. See Minn. Stat. § 518.17(2) (Supp. 1989). Even if joint custody is not awarded, Minnesota law provides that each parent, unless the court specifically directs otherwise to protect the welfare of a parent or the child, "has the right of access to, and to receive copies of, school, medical, dental, religious training, and other important records and information about the minor children"; the responsibility to "keep the other party informed as to the name and address of the school of attendance of the minor children"; the responsibility to "notify the other party of [an accident or serious illness of a minor child], and the name of the health care provider and the place of treatment"; and "the right to reasonable access and telephone contact with the minor children." Minn. Stat. § 518.17(3) (1988). Minnesota's two-parent notification law does no more than apply these general principles to the specific case of abortion.

Federal law contains similar provisions regulating the health and welfare of children that require the notification or consent of both parents. For example, one condition for obtaining a grant under the Adolescent Family Life Act is that an applicant must provide assurances that it will "notify the parents or guardians of any unemancipated minor requesting services [relating to family planning] from the applicant and . . . will obtain the permission of such parents or guardians with respect to the provision of such services." 42 U. S. C. § 300z–5(a)(22)(A)(i) (1982 ed.); see § 300z–5(a)(22)(A)(ii) (requiring only notice to parents or guardians if the unemancipated minor is pregnant). See also 42 U. S. C. § 5671(d) (1982 ed., Supp. V) (authorizing funding for certain experimental juvenile drug and alcohol treatment programs if safeguards are established for obtaining the informed consent of the "parents or guardians" of minors); 50 U. S. C. App. § 454(c)(4) (1982 ed.) (permitting induction of a 17-year-old into the Armed Forces with the written consent of his "parents or guardian"); 45 CFR § 46.408 (1989) (requiring consent of both parents before a minor may participate in medical research posing more than a "minimal" risk of harm). With all respect, I submit the Court today errs when it states that Minnesota's two-parent notice law is an "oddity among state and federal consent provisions." *Ante*, at 454.

## III

At least two Members of the Court concede, as they must, that a State has a legitimate interest in the welfare of the pregnant minor and that, in furtherance of this interest, the State may require the minor to notify, and consult with, one of her parents. See *ante*, at 444–446 (opinion of STEVENS, J.); cf. *ante*, at 469 (MARSHALL, J., concurring in part, concurring in judgment in part, and dissenting in part). The Court nonetheless holds the Minnesota statute unconstitutional because it requires the minor to notify not one parent, but both parents, a requirement that the Court says bears

no reasonable relation to the minor's welfare. See *ante*, at 450–455; cf. *ante*, at 469–472 (MARSHALL, J., concurring in part, concurring in judgment in part, and dissenting in part). The Court also concludes that Minnesota does not have a legitimate interest in facilitating the participation of both parents in the care and upbringing of their children. Given the substantial protection that minors have under Minnesota law generally, and under the statute in question, the judicial bypass provisions of the law are not necessary to its validity. The two-parent notification law enacted by Minnesota is, in my view, valid without the judicial bypass provision of subdivision 6.

### A

We have been over much of this ground before. It is beyond dispute that in many families, whether the parents are living together or apart, notice to both parents serves the interests of the parents and the minor, and that the State can legislate with this fact in mind. In *H. L.* v. *Matheson*, 450 U. S. 398 (1981), we considered the constitutionality of a statute which required a physician, before performing an abortion on a minor, to "'[n]otify, if possible, the [minor's] *parents* or guardian.'" *Id.*, at 400 (quoting Utah Code Ann. § 76–7–304 (1978)) (emphasis added). We held that the statute, as applied to unmarried, dependent, and immature minors, "plainly serves important state interests, is narrowly drawn to protect only those interests, and does not violate any guarantees of the Constitution." 450 U. S., at 413. Our holding was made with knowledge of the contentions, supported by citations to medical and sociological literature, that are proffered again today for the proposition that notification imposes burdens on minors. See *id.*, at 436–441 (MARSHALL, J., dissenting). We nonetheless rejected arguments that a requirement of parental notification was the equivalent of a requirement of parental consent, *id.*, at 411; that the statute was unconstitutional because it required notification only as to abortions, and not as to other medical

procedures, *id.*, at 412; and that the statute was unconstitutional because it might deter some minors from seeking abortions, *id.*, at 413.

Our decision was based upon the well-accepted premise that we must defer to a reasonable judgment by the state legislature when it determines what is sound public policy. JUSTICE STEVENS' opinion concurring in the Court's judgment relied upon an explicit statement of this principle. Concluding that the Utah statute requiring notification of both parents was valid as to all unmarried minors, both mature and immature, JUSTICE STEVENS reasoned that the State's interest in ensuring that a young woman considering an abortion receive appropriate consultation was "plainly sufficient to support a state legislature's determination that such appropriate consultation should include parental advice." *Id.*, at 423. The Court today departs from this rule. It now suggests that a general requirement that both parents be notified is unconstitutional because of its own conclusion that the law is unnecessary when notice produces favorable results, see *ante*, at 450, and irrational in all of the instances when it produces unfavorable results, see *ante*, at 450–451. In *Matheson*, JUSTICE STEVENS rejected these same arguments as insufficient to establish that the Utah statute was unconstitutional:

> "Of course, a conclusion that the Utah statute is invalid would not prevent young pregnant women from voluntarily seeking the advice of their parents prior to making the abortion decision. But the State may legitimately decide that such consultation should be made more probable by ensuring that parents are informed of their daughter's decision . . . .
>
>    .       .       .       .       .
>
> "Utah's interest in its parental-notice statute is not diminished by the fact that there can be no guarantee that meaningful parent-child communication will actually occur. Good-faith compliance with the statute's re-

quirements would tend to facilitate communication between daughters and parents regarding the abortion decision. *The possibility that some parents will not react with compassion and understanding upon being informed of their daughter's predicament or that, even if they are receptive, they will incorrectly advise her, does not undercut the legitimacy of the State's attempt to establish a procedure that will enhance the probability that a pregnant young woman exercise as wisely as possible her right to make the abortion decision."* 450 U. S., at 423–424 (emphasis added).

JUSTICE STEVENS' reasoning was correct then, and it remains correct today.

### B

In applying the standards established in our prior decisions to the cases at hand, "we must keep in mind that when we are concerned with extremely sensitive issues, such as the one involved here, 'the appropriate forum for their resolution in a democracy is the legislature. We should not forget that "legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." *Missouri, K. & T. R. Co.* v. *May,* 194 U. S. 267, 270 (1904) (Holmes, J.).' *Maher* v. *Roe,* 432 U. S. 464, 479–480 (1977) (footnote omitted)." *Akron* v. *Akron Center for Reproductive Health, Inc.,* 462 U. S. 416, 465 (1983) (O'CONNOR, J., dissenting). The Minnesota Legislature, like the legislatures of many States, has found it necessary to address the issue of parental notice in its statutory laws. In my view it has acted in a permissible manner.

All must acknowledge that it was reasonable for the legislature to conclude that in most cases notice to both parents will work to the minor's benefit. See *Bellotti II,* 443 U. S., at 640, n. 20 (opinion of Powell, J.) (parental involvement, if compassionate and supportive, is highly desirable). This is true not only in what the Court calls the "ideal family setting," where both parents and the minor live under one roof,

but also where the minor no longer lives with both parents. The Court does not deny that many absent parents maintain significant ties with their children, and seek to participate in their lives, to guide, to teach, and to care for them. It is beyond dispute that these attachments, in cases not involving mistreatment or abuse, are essential to the minor's well-being, and that parental notice is supportive of this kind of family tie. Although it may be true that notice to one parent will often result in notice to both, the State need not rely upon the decision of one parent to notify the other, particularly where both parents maintain ties with their daughter but not with each other, and when both parents share responsibilities and duties with respect to the child.

I acknowledge that in some cases notifying both parents will not produce desirable results despite the fact that no actual instance is in the record before us, as the two-parent notification requirement was enjoined before it went into effect. Cf. *ante*, at 438 (stating as a matter of historical fact that the "two-parent notification requirement *had* particularly harmful effects on both the minor and the custodial parent" and that fears that notification of an absent parent would produce harmful results "*were* often realized") (emphasis added). We need not decide today, however, whether the Constitution permits a State to require that a physician notify both biological parents before performing an abortion on any minor, for the simple reason that Minnesota has not enacted such a law.

The Minnesota statute in fact contains exceptions to ensure that the statutory notice requirement does not apply if it proves a serious threat to the minor's health or safety. First, the statute does not require notice at all costs; to comply with the law, a physician need only use "reasonably diligent effort" to locate and notify both of the minor's parents. If the second parent cannot be located, as may be the case if the parent has deserted the family or ceased to maintain contact with the minor or the other parent, the only notice required is to the first parent. Minn. Stat. § 144.343(3) (1988).

Second, even where both parents can be located, notice is not required if the physician certifies that the abortion is necessary to prevent the woman's death and there is insufficient time to provide the required notice, § 144.343(4)(a); if the minor's parents have authorized the abortion in writing, § 144.343(4)(b); or if the minor declares that she is the victim of sexual abuse, neglect, or physical abuse, § 144.343(4)(c). Under Minnesota law, "neglect" of a minor means the failure of a parent "to supply a child with necessary food, clothing, shelter or medical care when reasonably able to do so or failure to protect a child from conditions or actions which imminently and seriously endanger the child's physical or mental health when reasonably able to do so," Minn. Stat. § 626.556 (2)(c) (Supp. 1989); physical abuse is defined as "any physical injury inflicted by a person responsible for the child's care on a child other than by accidental means," § 626.556(2)(d); and sexual abuse includes any sexual contact by a parent or other person responsible for the child's care or in a position of authority with respect to the child, § 626.556(2)(a). I cannot believe that these exceptions are too narrow to eliminate from the statute's coverage those instances in which notice would place the minor in danger of parental violence or other conduct that is a real threat to the physical or mental health of the child.

The Court challenges the efficacy of this last exception because it believes that the statutory requirement that a physician report a minor's declaration of abuse to appropriate authorities, see Minn. Stat. § 144.343(4)(c) (1988), will deter minors from using the exception. This is not a proper basis for declaring the law invalid. Laws are not declared unconstitutional because of some general reluctance to follow a statutory scheme the legislature finds necessary to accomplish a legitimate state objective. Beyond any question it is reasonable for the State to require that physicians report declarations of abuse to ensure that mistreatment is known to authorities responsible for the protection of minors. This

requirement is but a single manifestation of the broad duty in Minnesota to report suspected cases of child abuse to the proper authorities. See Minn. Stat. § 626.556(1) (1988) (declaring it to be the public policy of the State "to protect children whose health or welfare may be jeopardized through physical abuse, neglect or sexual abuse" and "to strengthen the family and make the home, school, and community safer for children by promoting responsible child care in all settings").

No one can contend that a minor who is pregnant is somehow less deserving of the State's protection. It is reasonable to provide that any minor who contends that she cannot notify her parent or parents because she is the victim of neglect or abuse must allow the State to use its power to investigate her declaration and protect her from harm. Any parent, moreover, who responds to notice by threatening or harming the minor or the other parent may be prosecuted by the State to the full extent of its laws. See Minn. Stat. § 518B.01 (1988) (Domestic Abuse Act); Minn. Stat. §§ 609.221, 609.222, 609.223, 609.224 (1988 and Supp. 1989) (assault statutes); §§ 609.341 through 609.345 (sexual abuse statutes); § 609.378 (criminal neglect statute). Just as it relies upon such laws as its first line of defense for dealing with all other instances of abuse in family situations, so too is the State entitled to rely upon them here.

Notwithstanding the exceptions and protections we have discussed, it does remain possible, of course, that in some instances notifying one or both parents will not be in the minor's best interests. Allegations of a similar possibility, based upon sociological evidence similar to that presented in these cases, was made by the appellant in *Matheson*. See Brief for Appellant in *H. L.* v. *Matheson*, O. T. 1980, No. 79–5903, pp. 10–11; Brief for Planned Parenthood Federation of America, Inc., et al., as *Amici Curiae* in *Matheson* 16–31. The Court there held that the parental notification law was valid, at least as to immature minors, for the simple reason that a

law is not invalid if it fails to further the governmental interest in every instance. This point formed the cornerstone of JUSTICE STEVENS' concurring opinion in *Matheson*, see 450 U. S., at 423–424, and it finds its most explicit statement in the Court's opinion in *Parham* v. *J. R.*, 442 U. S., at 602–603:

> "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More importantly, historically, it has recognized that natural bonds of affection lead parents to act in the best interests of their children. . . .
>
> "As with so many other legal presumptions, experience and reality may rebut what the law accepts as a starting point; the incidence of child neglect and abuse cases attest to this. That some parents 'may at times be acting against the best interests of their children' . . . creates a basis for caution, but is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests."

The only cases in which a majority of the Court has deviated from this principle are those in which a State sought to condition a minor's access to abortion services upon receipt of her parent's consent to do so. In *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52 (1976), the Court invalidated a Missouri law requiring that a physician obtain the consent of one parent before performing an abortion. The Court's reasoning was unmistakable: "[T]he State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent." *Id.*, at 74. The Court today, ignoring this statement, relies heavily upon isolated passages from *Danforth*, see *ante*, at 452–453, and other cases involving parental consent laws,

see, *e. g., ante,* at 453 (citing *Bellotti II*). JUSTICE MAR-SHALL, on the other hand, expressly equates laws requiring parental consent with laws requiring parental notification, see *ante,* at 471–472 (MARSHALL, J., concurring in part, concurring in judgment in part, and dissenting in part).

The difference between notice and consent was apparent to us before and is apparent now. Unlike parental consent laws, a law requiring parental notice does not give any third party the legal right to make the minor's decision for her, or to prevent her from obtaining an abortion should she choose to have one performed. We have acknowledged this distinction as "fundamental," and as one "substantially modify[ing] the federal constitutional challenge." *Bellotti* v. *Baird (Bellotti I)*, 428 U. S. 132, 145, 148 (1976); see also *Matheson, supra,* at 411, n. 17. The law before us does not place an absolute obstacle before any minor seeking to obtain an abortion, and it represents a considered weighing of the competing interests of minors and their parents.

"It cannot be doubted that as long as a state statute is within 'the bounds of reason and [does not] assum[e] the character of a merely arbitrary fiat . . . [then] [t]he State . . . must decide upon measures that are needful for the protection of its people . . . .'" *Akron,* 462 U. S., at 459 (O'CONNOR, J., dissenting) (quoting *Purity Extract & Tonic Co.* v. *Lynch,* 226 U. S. 192, 204–205 (1912)). Like all laws of general application, the Minnesota statute cannot produce perfect results in every situation to which it applies; but the State is under no obligation to enact perfect laws. The statute before us, including the 48-hour waiting period, which is necessary to enable notified parents to consult with their daughter or their daughter's physician, if they so wish, and results in little or no delay, represents a permissible, reasoned attempt to preserve the parents' role in a minor's decision to have an abortion without placing any absolute obstacles before a minor who is determined to elect an abortion for her own interest as she sees it. Section 144.343, without the

judicial bypass provision of subdivision 6, is constitutional. I would reverse the contrary judgment of the Court of Appeals.

## IV

Because a majority of the Court holds that the two-parent notice requirement contained in subdivision 2 is unconstitutional, it is necessary for the Court to consider whether the same notice requirement is constitutional if the minor has the option of obtaining a court order permitting the abortion to proceed in lieu of the required notice. Minn. Stat. § 144.343 (6) (1988). Assuming, as I am bound to do for this part of the analysis, that the notice provisions standing alone are invalid, I conclude that the two-parent notice requirement with the judicial bypass alternative is constitutional.

The Court concludes that Minnesota's two-parent notice law without a judicial bypass is unconstitutional because of the possibility that, in some cases, the rule would not work to the benefit of minors or their parents. If one were to attempt to design a statute that would address the Court's concerns, one would do precisely what Minnesota has done in § 144.343(6): create a judicial mechanism to identify, and exempt from the strictures of the law, those cases in which the minor is mature or in which notification of the minor's parents is not in the minor's best interests. The bypass procedure comports in all respects with our precedents. See *Bellotti II,* 443 U. S., at 643–644 (opinion of Powell, J.); *Planned Parenthood Assn. of Kansas City, Mo., Inc.* v. *Ashcroft,* 462 U. S. 476, 491 (1983) (opinion of Powell, J.); *id.,* at 505 (O'CONNOR, J., concurring in judgment in part and dissenting in part); *Ohio* v. *Akron Center for Reproductive Health, post,* p. 502.

In providing for the bypass, Minnesota has done nothing other than attempt to fit its legislation into the framework that we have supplied in our previous cases. The simple fact is that our decision in *Bellotti II* stands for the proposition that a two-parent consent law is constitutional if it provides

for a sufficient judicial bypass alternative, and it requires us to sustain the statute before us here. In *Bellotti II*, the Court considered the constitutionality of a statute which required a physician to obtain, in most circumstances, the consent of both of a minor's parents before performing an abortion on the minor. See 443 U. S., at 625–626 (opinion of Powell, J.) (citing Mass. Gen. Laws. Ann., ch. 112, § 12S (West Supp. 1979)). Although eight Members of the Court concluded that the statute was unconstitutional, five indicated that they would uphold a two-parent consent statute with an adequate judicial bypass.

For four of the eight Justices forming the majority in *Bellotti II*, the failure of the statute lay in its inadequate bypass procedure, not its requirement that both of the minor's parents consent to the abortion. See 443 U. S., at 643 (opinion of Powell, J.). Justice Powell's opinion specifically stated that "if the State decides to require a pregnant minor to obtain *one or both* parents' consent to an abortion, it also must provide an alternative procedure whereby authorization for the abortion can be obtained," *ibid.* (emphasis added; footnote omitted), and then stated the minimum requirements for such a procedure. In response to the dissent's contention that his opinion was advisory, Justice Powell stated that the four Members of the Court thought it necessary

> "to provide some guidance as to how a State constitutionally may provide for adult involvement—either by parents or a state official such as a judge—in the abortion decision of minors. In view of the importance of the issue raised, and the protracted litigation to which these parties already have been subjected, we think it would be irresponsible simply to invalidate [the Massachusetts law] without stating our views as to the controlling principles." *Id.*, at 652, n. 32.

See also *id.*, at 651–652 (REHNQUIST, J., concurring) (joining Justice Powell's opinion because "unless and until [the Court is willing to overrule *Danforth*], literally thousands of judges

cannot be left with nothing more than the guidance offered by a truly fragmented holding of this Court").

JUSTICE WHITE dissented from the Court's judgment that the Massachusetts statute was unconstitutional. In his view no bypass was necessary, so it must follow that a two-parent consent statute with an adequate bypass procedure would have been valid. See *id.*, at 656–657. In sum, five Members of the Court in *Bellotti II* found, either by express statement or by implication, that it was permissible under the Constitution for a State to require the consent of two parents, as long as it provides a consent substitute in the form of an adequate judicial bypass procedure.

I cannot accept JUSTICE STEVENS' suggestion today that Justice Powell, in announcing these rules, did not "conside[r]" the fact that he was doing so in the context of a two-parent consent requirement, see *ante*, at 455–456. The statute was explicit in its command that both parents consent to the abortion. See 443 U. S., at 625–626. Justice Powell indicated that he was aware of this fact, see *id.*, at 630, and n. 10, and the dissent drew a specific contrast between the two-parent consent requirement then before the Court and the one-parent consent requirement before the Court in *Danforth*, see 443 U. S., at 656–657 (opinion of WHITE, J.); see also *id.*, at 653 (STEVENS, J., concurring in judgment). Aware of all of these circumstances, Justice Powell stated the controlling principles with specific reference to laws requiring the consent of "one or both" parents. *Id.*, at 643. Justice Powell's considered reasoning, coupled with the dissenting views of JUSTICE WHITE, was intended to set forth the dispositive principles of law for deciding the constitutionality of parental consent laws. The Court has relied upon these principles in deciding the constitutionality of laws requiring notice or the consent of one parent, see *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S., at 439–442 (consent); *Ohio* v. *Akron Center for Reproductive Health, post*, at 511–514 (notice). As *Bellotti II* dealt with the far more de-

manding requirement of two-parent consent, and approved of such a requirement when coupled with a judicial bypass alternative, I must conclude that these same principles validate a two-parent notice requirement when coupled with a judicial bypass alternative.

A second precedent that compels the conclusion that a two-parent notice law with a judicial bypass alternative is constitutional is our decision in *Matheson*. There we held that a two-parent notice statute without a bypass was constitutional as applied to immature minors whose best interests would be served by notice. Like the statute before the Court in *Matheson*, the Minnesota statute, as amended by subdivision 6, requires a physician to notify the parents of those immature minors whose best interest will be served by the communication.

If a two-parent notification law may be constitutional as applied to immature minors whose best interests are served by the law, but not as applied to minors who are mature or whose best interests are' not so served, a judicial bypass is an expeditious and efficient means by which to separate the applications of the law which are constitutional from those which are not. JUSTICE STEVENS' characterization of the judicial bypass procedure discussed in our past cases as a necessary "exception" to a "reasonable general rule," such as a one-parent consent requirement, see *ante*, at 456, 457, is far off the mark. If a judicial bypass is mandated by the Constitution at all, it must be because a general consent rule is unreasonable in at least some of its applications, and the bypass is necessary to save the statute. See, *e. g.*, *Bellotti II*, *supra*, at 643 (opinion of Powell, J.); *Matheson*, 450 U. S., at 420 (Powell, J., concurring). No reason can be given for refusing to apply a similar analysis to the less demanding case of a notice statute. It follows that a similar result should obtain: A law that requires notice to one or both parents is constitutional with a bypass. I thus concur in that portion of the judgment announced, but not agreed with, by JUSTICE STE-

VENS which affirms the Court of Appeals' conclusion that § 144.343(6) is constitutional.

V

In this case, the Court rejects a legislature's judgment that parents should at least be aware of their daughter's intention to seek an abortion, even if the State does not empower the parents to control the child's decision. That judgment is rejected although it rests upon a tradition of a parental role in the care and upbringing of children that is as old as civilization itself. Our precedents do not permit this result.

It is true that for all too many young women the prospect of two parents, perhaps even one parent, sustaining her with support that is compassionate and committed is an illusion. Statistics on drug and alcohol abuse by parents and documentations of child neglect and mistreatment are but fragments of the evidence showing the tragic reality that becomes day-to-day life for thousands of minors. But the Court errs in serious degree when it commands its own solution to the cruel consequences of individual misconduct, parental failure, and social ills. The legislative authority is entitled to attempt to meet these wrongs by taking reasonable measures to recognize and promote the primacy of the family tie, a concept which this Court now seems intent on declaring a constitutional irrelevance.